1  Valentin D. Gurvits (admitted *Pro Hac Vice*)
   Matthew Shayefar (admitted *Pro Hac Vice*)
2  BOSTON LAW GROUP, PC
   825 Beacon Street, Suite 20
3  Newton Centre, Massachusetts 02459
   Telephone: (617) 928-1806
4  Facsimile: (617) 928-1802
   vgurvits@bostonlawgroup.com
5  matt@bostonlawgroup.com

6  Evan Fray-Witzer (admitted *Pro Hac Vice*)
   CIAMPA FRAY-WITZER, LLP
7  20 Park Plaza, Suite 505
   Boston, Massachusetts 02116
8  Telephone: (617) 426-0000
   Facsimile: (617) 423-4855
9  Evan@CFWlegal.com

10 *Attorneys for Defendants Sagan Limited, MXN Ltd.,*
   *Netmedia Services Inc. and David Koonar*

11

**IN THE UNITED STATES DISTRICT COURT**
12                **DISTRICT OF ARIZONA**

| | |
|---|---|
| 13  Hydentra HLP Int. Limited, a foreign corporation d/b/a METART d/b/a | |
| 14  SEXART; | Case No. CV-16-1494-PHX-DGC |
| Hydentra, L.P. HLP General Partner, Inc., | |
| 15  a foreign corporation d/b/a METART d/b/a SEXART, | |
| 16      Plaintiffs, | **DEFENDANTS MXN LTD. AND SAGAN LIMITED'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** |
| 17  vs. | |
| 18  Sagan Limited, a Republic of Seychelles company, individually and d/b/a | ORAL ARGUMENT REQUESTED |
| 19  Porn.com; MXN Ltd., a Barbados company, individually and d/b/a | |
| 20  Porn.com; Netmedia Services Inc., a Canadian company, individually and d/b/a | |
| 21  Porn.com; David Koonar, an individual; and John Does 1-20, | |
| 22      Defendants. | |

1

2

*"They didn't purposely avail themselves of this forum. They're here because plaintiffs made them come here. There's none of the traditional minimal contacts that would make us think that it would be appropriate for the defendants to be sued here."*
- The Hon. Marcia G. Cooke[1]

3

## INTRODUCTION

4

5

This is, quite simply, what the Plaintiffs do. They sue foreign companies and

6

individuals who lack significant (or any) contacts with the United States, counting on the

7

fact that some defendants will enter into lucrative settlements – regardless of the case's

8

merit (or lack thereof) – rather than face the prospect of mounting a costly defense in a

9

far-flung jurisdiction. And, when a jurisdiction happens to catch on to Plaintiffs' *modus*

10

*operandi*, Plaintiffs simply move on to the next jurisdiction, as they have done here.[2]

11

The present case is no exception. Here, Plaintiffs Hydentra HLP Int. Limited and

12

Hydentra L.P. HLP General Partner, Inc. (collectively, "Hydentra"), each of which is

13

incorporated and operating under the laws of the Republic of Cyprus, have brought suit

14

against Defendants Sagan Limited, a Republic of Seychelles company ("Sagan"); MXN

15

16

[1] *Hydentra HLP Int. Limited v. Maximum Apps Inc.*, Case No. 15-22463 (S.D. Fla. May 18, 2016). *See* Exhibit 1 hereto.

17

[2] See, for example, cases from the Southern District of Florida: *Hydentra HLP Int. Limited v. Luchian*, 2016 WL 5951808, *17-18 (S.D. Fla. June 2, 2016) (dismissing at summary judgment claims against DMCA agent for website, as well as claims against corporate officer of website operator); *Hydentra HLP Int. Limited v. Maximum Apps Inc.*, Case No. 15-22463, Docket No. 86 (S.D. Fla. May 24, 2016) (granting motion to dismiss claims against officer of website operator); *Hydentra, L.P. HLP General Partner, Inc. et al v. Mindgeek USA Inc. et al*, Case No. 1:2015-cv-23230 (S.D. Fla.); *Hydentra, L.P. HLP General Partner, Inc. et al v. Era Technologies, Ltd. et al*, Case No. 1:2015-cv-24293 (S.D. Fla.); *Hydentra, L.P. HLP General Partner, Inc. et al v. Siracusa Management S.A. et al*, Case No. 1:2016-cv-20191 (S.D. Fla.) and subsequent appeals to the Eleventh Circuit Court of Appeals: *Hydentra HLP Int. Limited v. Maximum Apps Inc.*, Case No. 16-13087 (11th Cir.); *Hydentra HLP Int. Limited v. Constantin Luchian*, Case No. 16-14813 (11th Cir.).

18

19

20

21

22

1

MXN (CyberWeb) and Sagan's Motion to Dismiss for Lack of Personal Jurisdiction

1   Ltd., a Barbados Company ("CyberWeb");[3] Netmedia Services, Inc., a Canadian

2   company ("Netmedia"); and David Koonar, a Canadian resident, alleging that four (4) of

3   their videos[4] appeared without permission on a website (Porn.com), which is owned and

4   operated from entirely outside the U.S.  The common thread binding the parties

5   (Plaintiffs and Defendants) is this: none of them are from the U.S.  The allegedly

6   wrongful acts (if any) were not committed in the U.S. and the harm (if any) was not

7   suffered in the U.S.  The commonality is in the absences: the absence of connections with

8   the U.S.; the absence of personal jurisdiction against the Defendants; and (ultimately) the

9   absence of valid claims against the Defendants.

10          But, again, this is what the Plaintiffs do.  This Court should put a quick end to

11   Plaintiffs' misguided attempts to move their copyright-suit mill to Arizona, dismissing

12   the case against CyberWeb and Sagan for a lack of personal jurisdiction.  In support of its

13   Motion, CyberWeb and Sagan (referred herein as "Defendants") state as follows.

---

[3] CyberWeb, Ltd. is the current name of the MXN, Ltd.  Because the Declarations submitted in connection with Defendants' Motions to Dismiss use the company's existing name, CyberWeb, the same name is used in this memorandum of law.

[4] There is a reason why – on a website that hosts *well in excess of 500,000 videos*, the Plaintiffs are able to point to only four (4) videos that allegedly infringed Plaintiffs' copyrights: the Porn.com website employs extraordinary measures specifically designed to ensure that, if potentially infringing content is uploaded to the site, that it is detected and removed.  If this case were to proceed past the Rule 12 stage, the Court would learn that the Porn.com website utilizes both automated technology and human review to ensure that infringing content does not end up on the website.  With respect to the four videos at issue in this case, it appears that three of the videos in question escaped detection because they contained faint white watermarks that appeared on a white background, making them undetectable.  The fourth video, similarly, was uploaded by an individual (who has been terminated as a repeat infringer) who obscured Plaintiff's watermark with a different logo.  The Plaintiffs did not send DMCA takedown notices in connection with *any* of these four videos.  *See*, *infra*, pp. 7-9.

2

1

## FACTS RELEVANT TO JURISDICTION

2

The two Hydentra Plaintiffs are each foreign corporations, organized under the

3 laws of the Republic of Cyprus.  Complaint, ¶¶ 1-2.  Hydentra allegedly owns and

4 operates a number of adult entertainment websites and is the owner of certain copyrights

5 to the adult materials displayed at those websites.[5]  Complaint, ¶¶ 28-36.  In its complaint,

6 Hydentra alleges that its intellectual property has been infringed as a result of four (4)

7 videos which allegedly appeared at the website located at Porn.com.  Complaint, *passim*.

8 The Porn.com website currently hosts more than 579,000 videos.  Declaration of Kristen

9 Richardson in Support of Defendants' Motions to Dismiss ["Richardson Decl."], filed

10 herewith, ¶ 45.

11

CyberWeb, a Barbados company, is an owner of the Porn.com website.

12 Richardson Decl., ¶¶ 1-2.  CyberWeb's day-to-day activities are managed out of Barbados

13 by Mr. Kristen Richardson ("Mr. Richardson"), CyberWeb's Director.  *Id.*, ¶¶ 1, 3.  In

14 2008, Mr. Richardson moved to Barbados for the explicit purpose of running CyberWeb's

15 operations.  *Id.*, ¶ 3.  Mr. Richardson maintains CyberWeb's books, records and

16 accounting on a full-time basis from Barbados.  *Id.*  CyberWeb is not a "phantom"

17 company in Barbados.  It maintains an office and bank accounts in Barbados.  *Id.*, ¶ 4.

18 Barbados is and has always been CyberWeb's principal place of business (including when

19 it was known as MXN).  *Id.*

20

21

22

---

[5] Although the Complaint lists Hydentra LP HLP General Partner Inc. as a Plaintiff in the case, none of the copyrights asserted in the case are owned by that entity.  Defendant reserves the right to move on this matter.

MXN (CyberWeb) and Sagan's Motion to Dismiss for Lack of Personal Jurisdiction

CyberWeb has a contractual relationship with Sagan, a company registered in the Republic of the Seychelles, whereby Sagan engages web hosting and other related services for the Porn.com website.  *Id.*, ¶ 5.  As a result of this relationship, Sagan is listed as one of the "operators" of the Porn.com website both on the Porn.com website itself and on the Designation of Agent to Receive Notification of Claimed Infringement that has been filed with the United States Copyright Office.  *Id.*

Defendants have not had a presence in or significant contacts with the United States.  *Id.*, ¶ 53.  Neither CyberWeb nor Sagan has (and, at all relevant times, have never had) any employees in the United States.  *Id.*, ¶ 54.  They do not have (and, at all relevant times, have never had) a bank account in the United States.  *Id.*, ¶ 55.  They do not own or lease (and, at all relevant times, have never owned or leased) real estate in the United States.  *Id.*, ¶ 56.  They do not pay (and, at all relevant times, have never paid) income taxes in the United States.  *Id.*, ¶ 57.  And they does not have (and, at all relevant times, have never had) an agent for the service of process in the United States.  *Id.*, ¶ 58.

CyberWeb does *not* have a contractual relationship with defendant Netmedia Services Inc., a Canadian corporation ("Netmedia").  *Id.*, ¶ 6.  However, CyberWeb does have a relationship with (non-party) G.I.M. Corp., a Barbados corporation ("GIM"), pursuant to which GIM provides operational, technical, and other support for websites owned by CyberWeb, including the Porn.com website.  *Id.*  GIM subcontracts part of the operational and other support for the websites, including Porn.com, to Netmedia.  *Id.* ¶ 7.  *See*, *also*, Declaration of Philip Bradbury in Support of Defendants' Motions to Dismiss ["Bradbury Decl."], filed with Netmedia's Motion to Dismiss, ¶¶ 6-7; Declaration of

MXN (CyberWeb) and Sagan's Motion to Dismiss for Lack of Personal Jurisdiction

1    David Koonar in Support of Defendants' Motions to Dismiss ["Koonar Decl."], filed with

2    Koonar's Motion to Dismiss, ¶¶ 8, 10.

3        CyberWeb does not itself contract for server space; instead, that is one of the

4    functions performed by Sagan.  Richardson Decl., ¶¶ 5, 11.  Currently, the hosting

5    company that hosts the Porn.com website (pursuant to an agreement entered into by

6    Sagan), is Viking Host B.V., a company that is located in Amsterdam, Netherlands.  *Id.*, ¶

7    10-11.  Although Reflected Networks, Inc. previously provided hosting services for the

8    Porn.com website, currently all hosting services for the Porn.com website are with Viking

9    Host B.V.  *Id.*, ¶ 12.  The Porn.com website does not currently utilize Reflected Networks,

10   Inc. for hosting services.  *Id.*, ¶ 13.  The Porn.com website does not directly utilize (nor

11   did it ever directly utilize) Limelight Networks, Inc. for content delivery network services.

12   *Id.*, ¶ 14.  Although it is possible that the hosting companies utilized by CyberWeb

13   subcontract content delivery services to a subcontractor, such as Limelight Networks, Inc.,

14   Defendants have not entered into any agreements or arrangements with Limelight.  *Id.*

15       The majority of the revenue derived from the Porn.com website comes from

16   advertisements, which make up nearly 90% of the revenue.  *Id.*, ¶ 28.  CyberWeb does *not*

17   enter into any agreements directly with advertisers.  *Id.*, ¶¶ 31-32, 35.  Instead, CyberWeb

18   is part of an advertising program operated by the broker Traffic Force, which is owned by

19   another Barbados company, GIM.  *Id.*, ¶ 31.  CyberWeb is but one of approximately 1,300

20   websites that utilize Traffic Force.  *Id.*, ¶ 41.  The service operates in much the same way

21   as Google Ads: a website operator can sign up for the service and dedicate a portion of its

22   website to displaying advertisements.  *Id.*, ¶ 34.  In turn, an advertiser then purchases

5

MXN (CyberWeb) and Sagan's Motion to Dismiss for Lack of Personal Jurisdiction

views of these advertisements from various websites from Traffic Force to market their products.  *Id.*  CyberWeb does not select what advertising is displayed by Traffic Force.  *Id.*, ¶ 40.  CyberWeb makes available to Traffic Force "space" on the Porn.com website, and Traffic Force then sells that space as it sees fit to its advertiser clients.  *Id.*, ¶ 31.  Traffic Force then pays CyberWeb a fee based on the number of advertisement views it sold on the Porn.com website.  *Id.* ¶ 33.

CyberWeb does not decide what advertisements are displayed nor do any of the Defendants engage in "geolocation" to target viewers in a specific geographic location.  *Id.*, ¶¶ 30, 36-38.  Although it is possible for an advertiser to have their advertisements be targeted to viewers in a particular country or geographic region, any "geolocation" is always performed (when performed at all) by the advertisers themselves, and not by CyberWeb.  *Id.*, ¶ 36.  In other words, the Porn.com website does not specifically target Arizona or United States residents with advertisements aimed at their specific locations.  *Id.*, ¶ 37.  Although Traffic Force allows its advertisers to choose where geographically their ads are displayed, that process, if it takes place at all, happens before Traffic Force places an ad on the website and without any input from the Defendants.  *Id.*, ¶ 38.

For payments made by users on Porn.com, the website uses, for most transactions, the payment processors Paycom EU and Borgun Bank, neither of which are United States entities.  *Id.*, ¶ 15.  A small percentage of the transactions are processed by GoCoin, a bitcoin processor incorporated in the Isle of Man.  *Id.*  Paycom EU may provide services through the names Epoch and Epoch EU, but this is a decision made independent of CyberWeb and CyberWeb did not contract for services with the Epoch entity based in

California (or anywhere else in the United States). *Id.*, ¶ 16.  And, Paycom EU may have a relationship with PayPal, but this is a decision made independent of CyberWeb and CyberWeb did not contract for services with PayPal for this purpose. *Id.*, ¶ 17.

The Porn.com website is also a member of a Content Partner Program known as "Paid Per View," which is operated by the non-party Barbados company GIM. *Id.*, ¶ 46. Paid Per View allows studios and other content producers to upload their videos so that they can be displayed on member websites such as Porn.com. *Id.*, ¶ 47.  In this way, Porn.com receives additional licensed content for display and content producers receive a marketing channel: when a user visits a page that displays the videos provided by the content producer, typically there is a watermark on the video and a banner and/or link alongside the video that directs a user to visit the content producer's own website to purchase additional content. *Id.*, ¶ 49.  Over a thousand studios and other content producers utilize Paid Per View with the ability to distribute their content on approximately 10,000 websites. *Id.*, ¶ 48.

The Terms and Conditions for Premium Subscriptions to the Porn.com website does not, and has never, stated that they are governed by and construed under the laws of the State of California and the U.S. *Id.*, ¶ 18.  The Porn.com website has visitors from 250 distinct countries around the world. *Id.*, ¶ 46.  Over the last year or so, more than two-thirds of the visitors to the Porn.com website have come from outside of the U.S. *Id.*, ¶ 44.  The website is available in twelve different languages. *Id.*, ¶ 23.

Neither CyberWeb nor Sagan, nor any person, company, or entity operating on either of their behalf, uploaded any of the videos identified in the Plaintiffs' Complaint as

MXN (CyberWeb) and Sagan's Motion to Dismiss for Lack of Personal Jurisdiction

allegedly infringing.  *Id.*, ¶¶ 24-25.  To the contrary, Defendants have undertaken great efforts to combat uploads of unauthorized videos to the Porn.com website.  Among other efforts, the Porn.com website utilizes a watermark program that helps cut down on the uploading of unauthorized content on the Porn.com website by users (e.g., unauthorized copyrighted content) and which also allows content producers to monetize their works uploaded to the Porn.com website even if they are not originally authorized.  Bradbury Decl., ¶ 40.  The watermark program was originally implemented in January of 2012 and has over the years identified over 28,000 unique watermarks.  *Id.*, ¶ 42.  *Inter alia*, the watermark program allows content owners to select rules on videos that contain their watermarks, ranging from deleting the video before it is even made available on the website to allowing the content owner to monetize the video.  *Id.*, ¶¶ 43, 45-46.  Plaintiffs' watermarks were first added to the watermark program (even without the prompting of Plaintiffs) prior to the year 2015.  *Id.*, ¶ 44.  The watermark program has removed at least 86 videos from the Porn.com website that appeared to utilize Plaintiffs' watermarks, all without any intervention by Plaintiffs.  *Id.*, ¶ 47.

For three of the four allegedly infringing videos in this suit, the watermarks could not be detected despite best efforts because they were extremely faint and transparent white and nearly impossible to see.  *Id.*, ¶ 48 (see also <u>Exhibit 2</u> thereto).  The fourth video was uploaded with another watermark that completely covered the area where Plaintiffs' watermarks would usually be found.  *Id.*, ¶ 49 (see also <u>Exhibit 3</u> thereto).

Neither CyberWeb nor Sagan nor anyone on their behalf is "scraping" user information or videos from the websites of other companies for the Porn.com website.

MXN (CyberWeb) and Sagan's Motion to Dismiss for Lack of Personal Jurisdiction

1  Richardson Decl., ¶ 60.  Although Plaintiffs have alleged that one user has similar videos

2  and information as on other websites, this is not suspicious and does not suggest that

3  Defendants have been scraping.  *Id.*, ¶¶ 61-63. To the contrary, there exist services on the

4  Internet that create profiles on many tube sites at once and upload the same video to all

5  those websites at the same time, which would explain Plaintiffs' allegations.  *Id.*, ¶ 63.

6       Neither CyberWeb nor Sagan (nor anyone else on their behalf) received any

7  DMCA notices or any other takedown request about any of the videos that are the subject

8  of the complaint in this matter.  *Id.*, ¶ 65.  The videos that are the subject of the complaint

9  in this matter were removed promptly after Defendants saw the complaint.  *Id.*, ¶ 67.

10  Plaintiffs have only ever sent one DMCA notice for content on the Porn.com website

11  (which was not related to any of the videos that are the subject of the complaint in this

12  matter), and promptly after receipt of that notice the complained of material was removed

13  from and/or disabled on the Porn.com website.  *Id.*, ¶ 66.

14                        **ARGUMENT**

15  **I.     Legal Standard – Rule 12(b)(2)**

16       "When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff

17  bears the burden of demonstrating that the court has jurisdiction over the defendant."

18  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).  *See*, *also*, *Ziegler v.*

19  *Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995).  "When a defendant moves to

20  dismiss for lack of personal jurisdiction, the plaintiff is 'obligated to come forward with

21  facts, by affidavit or otherwise, supporting personal jurisdiction.'"  *Scott v. Breeland*, 792

22

1    F.2d 925, 927 (9th Cir. 1986) (quoting *Amba Marketing Systems, Inc. v. Jobar*

2    *International, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)).

3

4    **II.    The Complaint Must be Dismissed as to CyberWeb and Sagan Because the Court Lacks Personal Jurisdiction Over the Foreign Companies.**

5            Hydentra alleges that Defendants are subject to personal jurisdiction pursuant to

6    Fed. R. Civ. P. 4(k)(2).  Complaint, ¶ 24.  Rule 4(k)(2) provides for personal jurisdiction

7    where: (1) the claim against the defendant arises under federal law; (2) the defendant is

8    not subject to the jurisdiction of any state court of general jurisdiction; and (3) the federal

9    court's exercise of jurisdiction over the defendant comports with the due process

10   requirements of the United States Constitution.  *Holland America Line, Inc. v. Wartsila*

11   *North America, Inc.,* 485 F.3d 450, 461 (9th Cir. 2007).  Because the Court cannot

12   exercise personal jurisdiction over Defendants consistent with the due process

13   requirements of the U.S. Constitution, the Complaint against them must be dismissed.

14           Preliminarily, it should be noted that Rule 4(k)(2) sets an intentionally high

15   bar.  The Ninth Circuit has recognized that it is an exceedingly rare occurrence for a

16   Court to find jurisdiction under Rule 4(k)(2).  Indeed, in *Holland America Line, Inc.*

17   *v. Windstar Sail Cruises, Ltd.,* 485 F.3d 450 (9th Cir. 2007), the Court specifically

18   noted that "in the fourteen years since Rule 4(k)(2) was enacted, none of our cases has

19   countenanced jurisdiction under the rule."  *Id*. at 462.  Ten years later, it appears that

20   the Ninth Circuit is still waiting for a case in which it finds jurisdiction to be proper

21   under Rule 4(k)(2).

22

1    In *Holland America Line*, for example, the Court found that the plaintiff could

2    not demonstrate sufficient contacts with the United States, despite having alleged: (a)

3    that an alleged agent of the defendant agreed to a forum selection clause specifying

4    the United States (which the defendants denied); (b) that the defendants "sold

5    products or sponsored web marketing for products that ended up in Washington"; (c)

6    that marketing representatives and trainers visited the United States; (d) that the

7    defendants maintained a marketing website and advertised in various marine

8    publications; and (e) that the defendants made a presentation at a cruise ship

9    leadership forum in Miami, Florida, where the defendants sponsored a reception and

10   dinner tables.  *Holland America*, 485 F.3d at 459-60.

11       Similarly, in *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,

12   the Court found insufficient the fact that the defendant, a rice exporter located in India

13   had sent a total of 22 shipments of rice from India to ports on the West and East

14   Coasts of the United States as part of its commercial contracts.  284 F.3d 1114, 1127

15   (9th Cir. 2002).  Finally, in *Doe v. Unocal Corp.*, the Ninth Circuit found insufficient

16   the fact that the defendant corporation's stock was listed on U.S. Stock exchanges and

17   the fact that it had promoted the sale of its stock in the United States.  248 F.3d 915,

18   922 (9th Cir. 2001).

19       With that caution in mind, the "due process analysis under Rule 4(k)(2) is

20   nearly identical to traditional personal jurisdiction analysis with one significant

21   difference: rather than considering contacts between the [defendants] and the forum

22

1    state, we consider contacts with the nation as a whole." *Holland America*, 485 F.3d at

2    462 (citing *Pebble Beach*, 453 F.3d at 1159).

3        The Ninth Circuit employs a three-part test to determine whether sufficient

4    "minimum contacts" exist to exercise specific personal jurisdiction,[6] requiring that (1) the

5    defendant has "purposefully availed himself of the privileges of conducting activities in

6    the forum," (2) the claim results from this purposeful availment, and (3) "the exercise of

7    jurisdiction is reasonable." *Bancroft & Masters, Inc. v. Augusta National Inc.*, 223 F.3d

8    1082, 1086 (9th Cir. 2000) (citing *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 416

9    (9th Cir. 1997)).  If any of the three requirements is not satisfied, jurisdiction in the forum

10   would deprive the defendant of due process of law.  *See Omeluk v. Langsten Slip &*

11   *Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995); *Schwarzenegger v. Fred Martin Motor*

12   *Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

13       Indeed, "a higher jurisdictional barrier" exists where, as here, the defendants are

14   aliens as opposed to simply citizens from different states "because important sovereignty

15   concerns exist." *Sinatra v. National Enquirer*, 854 F.2d 1191, 1199 (9th Cir. 1988).

16       Additionally, a plaintiff may not attempt to aggregate the contacts of all of the

17   defendants.  Instead, "each defendant's contacts with the forum state must be assessed

18   individually rather than simply viewing them collectively." *Calder v. Jones*, 465 U.S.

19

---

20   [6] As this Court has held, "general jurisdiction would never apply in the context of Rule
     4(k)(2), because if a defendant had the continuous and systematic presence required for

21   general jurisdiction, it would be subject to suit in the state where it has such presence and
     Rule 4(k)(2) would therefore not apply."  *AMA Multimedia LLC v. Sagan Ltd.*, 2016 U.S.

22   Dist. LEXIS 141934, *6 (D. Ariz. Oct. 13, 2016).

783, 790 (1984).  *See*, *also*, *Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980) ("The Minnesota court also attempted to attribute State Farm's contacts to Rush by considering the 'defending parties' together and aggregating their forum contacts in determining whether it had jurisdiction.  The result was the assertion of jurisdiction over Rush based solely on the activities of State Farm.  Such a result is plainly unconstitutional."); *Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 781 (1984) ("Each defendant's contacts with the forum State must be assessed individually.").

In the present case, although the Complaint contains little that specifically addresses what CyberWeb or Sagan may have done (as opposed to other Defendants), Defendants assume that, because CyberWeb is an owner, and Sagan is an operator, of the Porn.com website, the Court will examine the operation of the Porn.com website as the relevant inquiry as it did in connection with Sagan alone in *AMA Multimedia LLC v. Sagan Ltd.*, 2016 U.S. Dist. LEXIS 141934 (D. Ariz. Oct. 13, 2016) ["*AMA*"].  Rather than ignore the elephant in the room (that the Court there found that Sagan was subject to personal jurisdiction), Defendants here choose to tackle it head-on.  Indeed, this Court's opinion in the *AMA* case provides an excellent road map for Defendants' legal analysis.  Here, however, different facts, additional facts, and a different Plaintiff compel a different result.

## A.      Defendants Have Not Directed their Actions at The United States

As this Court noted in *AMA*, the first step is an analysis of whether Defendants purposefully directed their actions at the United States.  The purposeful direction analysis, begins with (but does not end with) the so-called "effects test" from *Calder v. Jones*, 465

13

1    U.S. 783, 790 (1984).  "Under *Calder*, personal jurisdiction can be based upon: '(1)

2    intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of

3    which is suffered – and which the defendant knows is likely to be suffered – in the forum

4    state.'"  *Panavision Int'l, L.P. v. Toeppan*, 141 F.3d 1316, 1321 (9th Cir. 1998) (quoting

5    *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1486 (9th Cir. 1993)).

6           However, in the Ninth Circuit, it is not enough for the plaintiff to show that the

7    defendant committed an act and that the plaintiff felt an effect in the United States.  The

8    Ninth Circuit has been exceedingly cautious to stress that the plaintiff must show

9    "something more" – specifically that the defendant expressly aimed its actions at United

10   States.  *See*, *e.g.*, *Bancroft & Masters, Inc. v. Augusta National Inc.*, 223 F.3d 1082,

11   1088 (9th Cir. 2000) ("[*Calder*] cannot stand for the broad proposition that a foreign act

12   with foreseeable effects in the forum state always gives rise to specific jurisdiction.  We

13   have said that there must be 'something more'…  We now conclude that 'something

14   more' is what the Supreme Court described as 'express aiming' at the forum state.").

15   "The 'something more' additional requirement is important simply because the effects

16   cited may not have been caused by the defendant's actions of which the plaintiff

17   complains."  *Pebble Beach Co.*, 453 F.3d at 1160.  *See*, *also*, *Schwarzenegger*, 374 F.3d

18   at 807.

19          1.    Intentional Act

20          In the present case, as in the *AMA* case, Hydentra alleges that "Defendants"

21   intentionally distributed their copyrighted works and that, on information and belief, the

22   "Defendants" "actively uploaded and/or distributed pirated copyrighted files and/or

14

1    embedded code."  Complaint, ¶¶ 86.  Here, however, is the first crucial moment of

2    divergence from the facts as existed in the *AMA* case.  All the Defendants here –

3    including CyberWeb and Sagan – have denied in sworn statements that they uploaded the

4    works.  Richardson Decl., ¶ 24; Koonar Decl., ¶ 17; Bradbury Decl., ¶¶ 12.  To be clear,

5    the files at issue in this case were uploaded by the website's users and not any of the

6    Defendants (or anyone acting at their direction).  Richardson Decl., ¶¶ 25, 59; Koonar

7    Decl., ¶¶ 16-17; Bradbury Decl., ¶¶ 11-12.  Even if this were not the case, however, the

8    alleged acts could not have been aimed at the United States given that *Hydentra itself*

9    *(unlike AMA) is not a United States company.*  The Hydentra entities are each

10   incorporated in, and organized under the laws of the Republic of Cyprus.  As such, even

11   if the Defendants had committed the intentional act that Plaintiffs allege (which they did

12   not), such actions would be aimed at the Republic of Cyprus, where Hydentra is located,

13   if they are aimed anywhere.  These crucial differences compel a different outcome here.

14           2.    Expressly Aimed at Forum

15           Although the lack of an intentional act aimed at the forum should put an end to the

16   Court's analysis, Defendants nevertheless address the other "purposeful direction"

17   factors.  More specifically, in its opinion in *AMA,* this Court identified five factors that,

18   taken together, led the Court to conclude there that the Porn.com website was "expressly

19   aimed" at the United States.  Defendants address each of these factors in turn.

20           a.    Maintenance of a Website and U.S. Based Web Traffic

21           It is well established that the mere maintenance of a website available

22   anywhere in the world, does not meet the test of being "expressly aimed at the forum"

1  for the very reason that it is equally available everywhere in the world.  *See, e.g.*,

2  *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) ("We agree

3  that simply registering someone else's trademark as a domain name and posting a

4  web site on the Internet is not sufficient to subject a party domiciled in one state to

5  jurisdiction in another."); *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418-20 (9th

6  Cir. 1997) (noting that maintaining a website was not sufficient to constitute

7  "purposeful availment" without "something more" directly targeting the forum state).

8       Numerous other courts have similarly held that the maintenance of a website is

9  relevant to specific jurisdiction only where the site is expressly aimed at the forum,

10  which requires the plaintiff to prove that such acts "are performed for the very

11  purpose of having their consequences felt in the forum state."  *Dakota Indus., Inc. v.*

12  *Dakota Sportswear, Inc.,* 946 F.2d 1384, 1390-91 (8th Cir. 1991) (quoting *Brainerd*

13  *v. Governors of Univ. of Alberta*, 873 F.2d 1257, 1260 (9th Cir. 1989)).  *See*, *also*,

14  *Fraserside IP L.L.C. v. Hammy Media, LTD*, 2012 U.S. Dist. LEXIS 5359, 24-25

15  (N.D. Iowa Jan. 17, 2012) ("Although I accept as true Fraserside's allegations that

16  xHamster intentionally infringed Fraserside's registered copyrights and trademarks,

17  these allegations, alone, fail to demonstrate that xHamster 'uniquely or expressly

18  aimed' its tortious acts at Iowa....  Although xHamster's website is both commercial

19  and interactive, as an Iowa district court noted in a case presenting similar facts, such

20  a website 'is arguably no more directed at Iowa than at Uzbekistan.'"); *be2 LLC v.*

21  *Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011) ("If the defendant merely operates a

22  website, even a 'highly interactive' website, that is accessible from, but does not

1   target, the forum state, then the defendant may not be haled into court in that state

2   without offending the Constitution."); *Toys "R" Us, Inc. V. Step Two, S.A.,* 318 F.3d

3   446, 452-54 (3d Cir. 2003) ("[T]he mere operation of a commercially interactive web

4   site should not subject the operator to jurisdiction.... Rather, there must be evidence

5   that the defendant 'purposefully availed' itself of conducting activity in the

6   [jurisdiction]."); *Instabook Corp. v. Instapublisher.com*, 469 F. Supp. 2d 1120, 1127

7   (S.D. Fla. 2006) (finding insufficient contacts in a patent infringement case since,

8   among other reasons, "Defendant could not reasonably anticipate being haled into

9   court in Florida based on its operation of interactive websites accessible in Florida

10   and its sales to two Florida residents" in the absence of "targeting or solicitation of

11   Florida residents"); *ESAB Group, Inc. v. Centricut, L.L.C.*, 34 F. Supp. 2d 323, 331

12   (D.S.C. 1999) ("While it is true that anyone, anywhere could access Centricut's home

13   page, including someone in South Carolina, it cannot be inferred from this fact alone

14   that Centricut deliberately directed its efforts toward South Carolina residents.");

15   *Johnson v. Arden*, 614 F.3d 785, 797-98 (8th Cir. 2010) ("[T]he Johnsons have failed

16   to prove that www.BoutiqueKittens.com is uniquely or expressly aimed at Missouri;

17   thus *Calder* provides no support for their Lanham Act claim."); *Liberty Media*

18   *Holdings, LLC v. Letyagin, et al.*, Civil No. 11-62107-CV-Williams (S.D. Fla. Dec.

19   14, 2011) ("Precedent, however, establishes that maintaining a website accessible to

20   users in a jurisdiction does not subject a defendant to be sued there: those users must

21   be directly targeted, such that the defendant can foresee having to defend a lawsuit...."

22   (and cases cited therein)).

17

MXN (CyberWeb) and Sagan's Motion to Dismiss for Lack of Personal Jurisdiction

1    This is a lesson that Hydentra should have learned from the Court's decision in

2  *Hydentra HLP Int. Limited v. Maximum Apps Inc.*, Case No. 15-22463, Docket No.

3  86 (S.D. Fla. May 24, 2016) ["*Maximum Apps*"].  There, Hydentra made allegations

4  against the operators of the Sex.com website that were, if anything, more substantial

5  than the allegations made here.  *Id.*, Docket No. 5 (First Amended Complaint).

6  Nevertheless, the Court specifically found that the allegations could not support a

7  finding that the Sex.com website was aimed at the United States, holding that "there's

8  no evidence of an intentional tort aimed at this state that the defendant would use to

9  cause harm to people here, it's just not evident."  *See* <u>Exhibit 1</u> hereto, p. 39

10 (transcript of hearing on motion to dismiss, ending in dismissal)**.**

11   Nor does the analysis change simply because a large percentage of a website's

12 traffic comes from the United States.  In *Maximum Apps*, Hydentra had alleged that

13 40% of the visitors to the Sex.com website came from the United States.  *Maximum*

14 *Apps*, Docket No. 5, ¶ 10.  Other federal courts have similarly rejected the argument

15 that a foreign defendant may be subject to personal jurisdiction in the United States

16 based on a website that garners significant traffic from the United States.  *See*, *e.g.*,

17 *Liberty Media Holdings, LLC v. Letyagin, et al.*, Civil No. 11-62107-CV-Williams

18 (S.D. Fla. Dec. 14, 2011) ("Plaintiff contends that Defendant has 'considerable' web

19 traffic originating from the United States and has presented an exhibit showing that

20 fifteen percent of the visitors to the website are from the United States.  Precedent,

21 however, establishes that maintaining a website accessible to users in a jurisdiction

22 does not subject a defendant to be sued there: those users must be directly targeted,

1    such that the defendant can foresee having to defend a lawsuit...." (and cases cited

2    therein)); *Fraserside IP L.L.C. v. Hammy Media, LTD*, 2012 U.S. Dist. LEXIS 5359

3    (N.D. Iowa Jan. 17, 2012) (rejecting personal jurisdiction despite allegations that

4    "xHamster's website www.xHamster.com is visited daily by over 1,500,000 internet

5    users worldwide with roughly 20 percent of the site's visitors being from the United

6    States"); *Fraserside IP, L.L.C. v. Youngtek Solutions, Ltd.*, 2013 U.S. Dist. LEXIS

7    3779 (N.D. Iowa Jan. 10, 2013) (allegations that "17 to 20 percent of visitors to

8    Youngtek's websites are U.S. citizens"); *Fraserside IP L.L.C. v. Netvertising Ltd.,*

9    2012 U.S. Dist. LEXIS 180949 (N.D. Iowa Dec. 21, 2012) (allegations that "16.7%

10   percent of HardSexTube's website's daily visitors are from the United States");

11   *Fraserside IP L.L.C. v. Letyagin*, 885 F. Supp. 2d 906 (N.D. Iowa 2012) (allegations

12   that "eighteen percent of SunPorno's website's 2,500,000 daily visitors are from the

13   United States); *Fraserside IP L.L.C. v. Youngtek Solutions Ltd.,* 2012 U.S. Dist.

14   LEXIS 98041 (N.D. Iowa July 16, 2012) (allegations that "the EmpFlix.com website

15   is allegedly visited daily by over 1,500,000 internet users worldwide with

16   approximately 16.9 percent of the site's visitors coming from the United States. The

17   TNAFlix.com website is allegedly visited daily by over 3,000,000 internet users

18   worldwide with approximately 21.5 percent of the site's visitors coming from the

19   United States").

20          Given the Ninth Circuit's repeated admonition that person jurisdiction requires

21   "something more" than "a foreign act with foreseeable effects in the forum," these

22   holdings are not surprising.  *Bancroft & Masters*, 223 F.3d at 1088.  Yes, the United

19

MXN (CyberWeb) and Sagan's Motion to Dismiss for Lack of Personal Jurisdiction

1   States of America enjoys pornography.  Yes, any website that displays pornography is

2   likely to attract visitors throughout the world (including perhaps visitors from the

3   United States).  But, no, this does not mean that maintaining a website that displays

4   pornography automatically subjects the owners or operators of such a site to personal

5   jurisdiction in the United States.

6                          b.      Advertising and "Geolocation"

7          This Court expressed concern, too, over what it understood to be Sagan's

8   contacts with U.S. advertisers and/or advertising brokers.  This is understandable

9   given that the Plaintiffs did not accurately represent the process by which

10  advertisements appear on the Porn.com website, a process that takes place (as far as

11  the Defendants are connected to it) entirely outside of the United States.

12         Defendants do *not* enter into any agreements directly with advertisers.  Instead,

13  CyberWeb is part of an advertising program operated by the advertising broker Traffic

14  Force, which is operated by the non-party Barbados company GIM.  Richardson Decl., ¶

15  31.  CyberWeb is but one of approximately 1,300 publishers that utilize Traffic Force.

16  *Id.*, ¶ 41.  CyberWeb makes available to Traffic Force "space" on the Porn.com website,

17  and Traffic Force then sells that space as it sees fit to its advertiser clients.  *Id.*, ¶ 31.

18  CyberWeb does not select what advertising is displayed by Traffic Force.  *Id.*, ¶ 40.

19  Traffic Force then pays CyberWeb a fee based on the number of advertisements views it

20  sold on the Porn.com website.  *Id.* ¶ 33.

21         The Defendants do not engage in "geolocation" of advertisements to target viewers

22  in a specific geographic location.  *Id.*, ¶¶ 30, 36-38.  Although it is possible for an

1  advertiser to have their advertisements be targeted to viewers in a particular country or

2  geographic region, any "geolocation" is always performed (when performed at all) by the

3  advertisers themselves, and not by CyberWeb.  *Id.*, ¶ 36.  Although Traffic Force allows

4  its advertisers to choose where geographically their advertisements are displayed, that

5  process, if it takes place at all, happens before Traffic Force places an advertisement on

6  the website and without any input from the Defendants.  *Id.*, ¶ 38.

7       In sum, Defendants' only relationship that exists concerning advertising on the

8  Porn.com website is CyberWeb's relationship with GIM, the Barbados company that

9  owns the Traffic Force program.  *Id.*, ¶¶ 31-32.  This relationship creates no

10  additional connections to the United States.  *See*, *e.g.*, *Zamora Radio, LLC v. Last.FM*

11  *Ltd.*, 2011 WL 2580401, *7-8 (S.D. Fla. 2011) ("Although ... some of AccuRadio's

12  ad-serving vendors may display different commercial ads to different viewers of

13  AccuRadio's site based on the viewer's location, we agree that these advertisements

14  are not for AccuRadio's service and AccuRadio merely provides banner advertising

15  space on its website for unrelated products and services.... If it were otherwise, all

16  media outlets that feature advertisements may become subject to personal jurisdiction

17  in any state regardless of whether they have actually directed their own business

18  activities to the forum."); *Dynetech Corp. v. Leonard Fitness,* 523 F.Supp.2d 1344,

19  1347 (M.D. Fla. 2007) (holding that "the fact that the website of a company that sells

20  products in Florida can be reached via a link on Defendants' website is too narrow a

21  thread on which to find a meaningful 'contact' for the purposes of due process");

22  *Fraserside IP L.L.C. v. Letyagin*, 885 F. Supp. 2d 906, 917 (N.D. Iowa 2012)

21

MXN (CyberWeb) and Sagan's Motion to Dismiss for Lack of Personal Jurisdiction

1   ("[T]hese advertisements are not for SunPorno's services and SunPorno merely

2   provides banner advertising space on its website for unrelated services and are

3   insufficient to establish personal jurisdiction."); *Boschetto v. Hansing,* 539 F.3d 1011,

4   1022 (9th Cir. 2008) (Rymer, J., concurring) ("As we have previously held, merely

5   advertising over the Internet is not sufficient to confer jurisdiction throughout the

6   United States, even though the advertisement or website at issue may be viewed

7   nationwide." (citations omitted)); *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418

8   (9th Cir. 1997) ("[S]o far as we are aware, no court has ever held that an Internet

9   advertisement alone is sufficient to subject the advertiser to jurisdiction in the

10  plaintiff's home state."); *Gator.com Corp. v. L.L. Bean, Inc.*, 341 F.3d 1072, 1080

11  (9th Cir. 2003), vacated as moot by virtue of settlement in *Gator.com Corp. v. L.L.*

12  *Bean, Inc.*, 398 F.3d 1125, 1143 (9th Cir. 2005) (requiring "in the specific jurisdiction

13  context, "something more" than "mere advertisement or solicitation ... on the

14  Internet....").

15              c.   <u>Hosting and Content Delivery Networks</u>

16          CyberWeb does not itself contract for server space for the Porn.com website;

17  instead, that is one of the functions performed by Sagan.  As such, to the extent such an

18  agreement would even factors into the analysis, it is irrelevant with respect to CyberWeb.

19  Currently, the hosting company that hosts the Porn.com website (pursuant to an agreement

20  entered into by Sagan) is Viking Host B.V., a company that is located in Amsterdam,

21  Netherlands.  Richardson Decl., ¶¶ 10-11.  Although Reflected Networks, Inc. previously

22  provided hosting services for the Porn.com website, the website does not currently utilize

1   Reflected Networks, Inc. and all hosting services are provided by Viking Host B.V.  *Id.*,

2   ¶¶ 12-13.

3          The Porn.com website does not directly utilize (nor did it ever directly utilize)

4   Limelight Networks, Inc. for content delivery network services.  *Id.*, ¶ 14.  Although it is

5   possible that the hosting companies utilized by Defendants subcontract content delivery

6   services to a subcontractor, such as Limelight Networks, Inc., Defendants do not have any

7   agreements or arrangements directly with Limelight.  *Id.*

8          Ultimately, the previous agreement with a U.S. based hosting company is not

9   enough to establish personal jurisdiction over Defendants because, as the Ninth Circuit

10   has previously held, "an out-of-state party does not purposefully avail itself of a forum

11   merely by entering into a contract with a forum resident."  *HK China Group, Inc. v.*

12   *Beijing United Auto. & Motorcycle Mfg. Corp.,* 417 Fed. Appx. 664, 666 (9th Cir. 2011)

13   (*citing  Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("If the question is

14   whether an individual's contract with an out-of-state party *alone* can automatically

15   establish sufficient minimum contacts in the other party's home forum, we believe the

16   answer clearly is that it cannot.")).

17                    d.    Content Partnership Program

18          The Court also identified the Porn.com website's connections to content partners as

19   a potential factor in considering specific jurisdiction.  Putting aside the fact that any such

20   partnerships are irrelevant to the Plaintiffs' claims (and therefore not relevant to a specific

21   jurisdiction analysis), it would appear that the Court has not been fully informed as to the

22   nature of the Content Partnership Program.

23

MXN (CyberWeb) and Sagan's Motion to Dismiss for Lack of Personal Jurisdiction

The Porn.com website is also a member of a Content Partner Program known as "Paid Per View," which is operated by the non-party Barbados company GIM. *Id.*, ¶ 46. Paid Per View allows studios and other content producers to upload their videos so that they can be displayed on member websites such as Porn.com. *Id.*, ¶ 47. In this way, Porn.com receives additional licensed content for display and content producers receive a marketing channel: when a user visits a page that displays the videos provided by the content producer, typically there is a watermark on the video and a banner and/or link alongside the video that directs a user to visit the content producer's own website to purchase additional content. *Id.*, ¶ 49. Over a thousand studios and other content producers utilize Paid Per View with the ability to distribute their content on approximately 10,000 websites. *Id.*, ¶ 48.

So, to the extent that there are "content partners" who provide videos that appear on the Porn.com website, it is not as a result of Defendants entering into agreements with such content partners, but rather the result of those content providers entering into agreements with Paid Per View. Clearly, such arrangements do not implicate personal jurisdiction considerations or create additional ties to the United States.

### e.   Appointment of DMCA Agent

Finally, the Court appears to have taken into consideration the fact that the Porn.com website has registered an agent for the receipt of takedown notices with the United States Copyright Office. Here, however, the Court's consideration was contrary to both long-standing case law and public policy.

1    First, courts have long held that a party's interactions with a United States

2  government agency cannot be part of the jurisdictional analysis.  *See, e.g.*, *LG Display*

3  *Co., LTD. v. Obayashi Seikou Co., LTD*, 919 F. Supp. 2d 17, 27 (D.D.C. 2013)

4  ("Stated simply, a party's contacts with government agencies do not enter the

5  jurisdictional calculus."); *Freiman v. Lazur*, 925 F. Supp. 14, 24 (D.D.C. 1996)

6  (government contacts doctrine prevented the exercise of personal jurisdiction when

7  the defendant applied to register a copyright with the U.S. Copyright Office in

8  Washington, D.C.); *Mgmt. Insights, Inc. v. CIC Enters., Inc.,* 2001 U.S. Dist. LEXIS

9  24221 (D. Tex. 2001) ("[W]ere the Court to assume, arguendo, that CIC does have

10  regular and continuous contact with the DOL, the Court finds that the government

11  contacts exception to personal jurisdiction applies to restrict the Court from premising

12  extension of jurisdiction over CIC on its contacts with a governmental entity."); *Lamb*

13  *v. Turbine Designs, Inc.,* 41 F. Supp. 2d 1362, 1365 (N.D. Ga. 1999) ("Rooted in the

14  constitutional right to petition the government and first recognized in the District of

15  Columbia, the 'governmental contacts' principle prevents a court from exercising

16  jurisdiction based solely on a defendant's contact with a federal instrumentality.").

17    Additionally, the United States Supreme Court has long rejected the general

18  notion that the appointment of an agent – even for the *much* more substantial and

19  relevant role of acceptance of service of process – can be used to establish jurisdiction

20  over a corporate defendant.  *Chipman, Ltd. v. Thomas B. Jeffery Co.,* 251 U.S. 373,

21  379 (1920) ("Unless a foreign corporation is engaged in business within the State, it is

22  not brought within the State by the presence of its agents.").  *See, also, King v.*

1    *American Family Mutual Insurance Company*, 632 F.3d 570, 576 (9th Cir. 2011)

2    ("[I]t is the corporate activities of the defendant, not just the mere designation of a

3    statutory agent, that is helpful in determining whether the court has personal

4    jurisdiction over the defendant." (citing *Perkins v. Benguet Consolidated Mining Co.,*

5    342 U.S. 437 (1952))).[7]

6         Finally, consideration of the Porn.com website's DMCA agent as part of a

7    jurisdictional analysis would run counter to public policy and defeat the *protections*

8    provided to rights-holders under the DMCA.  Congress enacted the DMCA to "foster

9    cooperation among copyright holders and service providers in dealing with

10   infringement on the Internet....  These considerations are reflected in Congress'

11   decision to enact a notice and takedown protocol encouraging copyright holders to

12   identify specific infringing material to service providers." *UMG Recordings, Inc. v.*

13   *Shelter Capital Partners LLC*, 718 F.3d 1006, 1021-22 (9th Cir. 2013).  If a foreign

14   website-operator subjects itself to jurisdiction within the United States simply by

15   virtue of designating a DMCA agent, the website operator will have strong incentive

16   not to do so, thwarting the purposes of the DMCA.

17

18

19

_____

20   [7] Other Circuits have also rejected the argument that appointing a registered agent is
sufficient to establish general personal jurisdiction over a corporation.  *See, e.g.*,

21   *Bankhead Enterprises, Inc. v. Norfolk & Western Railway Co.,* 642 F.2d 802, 805 (5th
Cir. 1981); *Wenche Siemer v. Learjet Acquisition Corp.,* 966 F.2d 179, 183 (5th
Cir.1992); *Ratliff v. Cooper Laboratories, Inc.,* 444 F.2d 745, 748 (4th Cir.1971);

22   *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1293 (11th Cir. 2000).

MXN (CyberWeb) and Sagan's Motion to Dismiss for Lack of Personal Jurisdiction

1

3. <u>Harm in the Forum</u>

2       In *AMA*, the Court then returned to the question of foreseeable harm in the

3 forum, finding that this "element is satisfied when defendant's intentional act has

4 'foreseeable effects' in this forum." *AMA*, p. 9.  The Court found that, because AMA

5 was "a United States company with its principle place of business in Nevada,"

6 potential harm to AMA was foreseeable.  *Id.*  The same cannot be said here.  The

7 Hydentra companies are not U.S. companies, but rather are incorporated and operate

8 under the laws of the Republic of Cyprus.  *If* Defendants had committed an

9 intentional act (which they did not) that act would have been felt (if at all) in Cyprus.

10 This crucial distinction compels a different outcome than the one reached in *AMA*.

11

4. <u>Causation</u>

12       Given that there was no in-forum intentional act taken by Defendants (the

13 Defendants deny uploading any of the four videos in question or instructing anyone to

14 do so), there can be no "but for" causation between such (non-)acts and any injury

15 allegedly suffered by the Plaintiffs.  Moreover, it is important to keep in mind that

16 Hydentra is alleging that four (4) of its videos improperly appeared amongst the more

17 than 570,000 videos that are hosted on the Porn.com website.  It can hardly be argued

18 that Porn.com has taken some in-forum action that has resulted in the site being used

19 for widespread infringing activities.  To the contrary, if this case progresses past the

20 motion to dismiss stage, the Court will find that the Defendants have taken

21 extraordinary (and very successful) steps to prevent infringing materials from

22 appearing on the Porn.com website (see *supra* regarding watermark program).

1          **B.      An Exercise of Jurisdiction Over Defendants is Unreasonable**

2          1.     Standard

3          Even though Hydentra has failed to satisfy the requirements of the minimum

4     contacts tests and, therefore personal jurisdiction cannot attach to Defendants, the

5     Complaint must also be dismissed as an exercise of personal jurisdiction over

6     Defendants would be unreasonable. "For jurisdiction to be reasonable, it must

7     comport with 'fair play and substantial justice.'" *Panavision Int'l, L.P. v. Toeppan*,

8     141 F.3d 1316, 1322 (9th Cir. 1998).  Exercise of jurisdiction over the Defendants

9     here would be unreasonable and against fair play and substantial justice.

10         The Supreme Court has set out seven factors for a court to consider when

11    evaluating reasonableness of personal jurisdiction: "(1) the extent of a defendant's

12    purposeful interjection; (2) the burden on the defendant in defending in the forum; (3)

13    the extent of conflict with the sovereignty of the defendant's state; (4) the forum

14    state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of

15    the controversy; (6) the importance of the forum to the plaintiff's interest in

16    convenient and effective relief; and (7) the existence of an alternative forum." *Id.* at

17    1323 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77(1985)).  The

18    court must balance all seven factors as none of the factors are dispositive in

19    themselves.  *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1488 (9th Cir. 1993).

20         2.     The Reasonableness Factors Favor Defendants.

21         Each of these factors weighs in favor of Defendants.  Therefore, the balance of

22    these seven factors necessarily weighs on the side of the Defendants. Evaluating each:

**Factor 1: <u>Defendants did not purposefully interject themselves into the United States.</u>**  CyberWeb is a Barbados company actively managed out of Barbados, that owns a website available worldwide.  Sagan is a Seychelles company with its principle place of business in the Seychelles.  Defendants' relationships are with non-United States companies.  Defendants have done nothing to purposely direct their actions at the United States.

**Factor 2: <u>Defendants have minimal connections to the United States and would experience a great burden by having to defend in Arizona.</u>**  CyberWeb is located in Barbados and Sagan in the Seychelles; their manager lives in Barbados; their records are maintained in Barbados and the Seychelles.  Almost all of the witnesses and records in this case will be located in Barbados, Canada, or the Seychelles.  As such, there is no basis for exercising jurisdiction in the United States.

**Factor 3: <u>The court's exercise of jurisdiction in the United States would conflict with the sovereignty of Barbados and the Seychelles.</u>**  The legal analysis in the United States and Barbados and the Seychelles would be sufficiently divergent as to implicate the sovereignty concerns of Barbados and the Seychelles.

**Factor 4: <u>The United States does not have an interest in providing Hydentra with a forum for its allegation.</u>**  The Hydentra companies are Cyprus entities.  To the extent that a country has an interest in protecting their rights, that country is the Republic of Cyprus.

**Factor 5: <u>The majority of witnesses in this action are located outside of the United States.</u>**  Defendants' witnesses are located in Barbados; other Defendants'

1   witnesses will come from Canada and Barbados; certain witnesses and documents

2   may come from the Seychelles.  With the possible exception of certain experts (and

3   the lawyers), most everyone required for trial will come from outside the U.S.

4          **Factor 6: <u>As explained above, litigation in the United States would be</u>**

5   **<u>inconvenient for Defendants because the majority of witnesses and documents</u>**

6   **<u>come from outside the United States.</u>**

7          **Factor 7: <u>Defendants' home countries respect copyrights and, as such, are</u>**

8   **<u>adequate and alternative forums for this suit.</u>**

9          Based on the above factors, it would be unreasonable to exercise personal

10  jurisdiction over Defendants and therefore the exercise of personal jurisdiction would

11  be in violation of the Due Process Clause of the Constitution.

12                              **<u>CONCLUSION</u>**

13         For these reasons, the Complaint against Defendants should be dismissed in its

14  entirety for lack of personal jurisdiction pursuant to Rule 12(b)(2).

15  Respectfully submitted,                    Dated: March 10, 2017

16  /s/ Valentin D. Gurvits                    /s/ Evan Fray-Witzer
    Valentin D. Gurvits (*Pro Hac Vice*)       Evan Fray-Witzer (*Pro Hac Vice*)
17  Matthew Shayefar (*Pro Hac Vice*)          CIAMPA FRAY-WITZER, LLP
    BOSTON LAW GROUP, PC                       20 Park Plaza, Suite 505
18  825 Beacon Street, Suite 20                Boston, Massachusetts 02116
    Newton Centre, Massachusetts 02459         Telephone: (617) 426-0000
19  Telephone: (617) 928-1806                  Facsimile: (617) 423-4855
    Facsimile: (617) 928-1802                  Evan@CFWlegal.com
20  vgurvits@bostonlawgroup.com
    matt@bostonlawgroup.com
21
    *Attorneys for Defendants CyberWeb, Ltd. (previously known as MXN Ltd.) and Sagan*
22  *Limited*

1

## **Certificate Pursuant to Court's Order (Docket No. 26)**

2

Pursuant to the Court's Order dated January 6, 2017 (Docket No. 26), undersigned

3 counsel hereby certifies that on February 28, 2017 he met and conferred by telephone

4 with counsel for Plaintiffs to determine whether an amendment could cure the

5 deficiencies in the Complaint.  The Parties were unable to agree that the Complaint was

6 curable by a permissible amendment.

7                       /s/ Matthew Shayefar, Esq.
                      Matthew Shayefar, Esq.

8

9

## **Certificate of Service**

10

I hereby certify that on March 10, 2017, I electronically submitted the above

11 document to the Clerk of the United States District Court, District of Arizona, using the

12 online e-filing system.

13                       /s/ Matthew Shayefar, Esq.
                      Matthew Shayefar, Esq.

14

15

16

17

18

19

20

21

22