1  Valentin D. Gurvits (admitted *Pro Hac Vice*)
   Matthew Shayefar (admitted *Pro Hac Vice*)
2  BOSTON LAW GROUP, PC
   825 Beacon Street, Suite 20
3  Newton Centre, Massachusetts 02459
   Telephone: (617) 928-1806
4  Facsimile: (617) 928-1802
   vgurvits@bostonlawgroup.com
5  matt@bostonlawgroup.com

6  Evan Fray-Witzer (admitted *Pro Hac Vice*)
   CIAMPA FRAY-WITZER, LLP
7  20 Park Plaza, Suite 505
   Boston, Massachusetts 02116
8  Telephone: (617) 426-0000
   Facsimile: (617) 423-4855
9  Evan@CFWlegal.com

10 *Attorneys for Defendants Sagan Limited, MXN Ltd.,
   Netmedia Services Inc. and David Koonar*

11

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Hydentra HLP Int. Limited, a foreign corporation d/b/a METART d/b/a SEXART; Hydentra, L.P. HLP General Partner, Inc., a foreign corporation d/b/a METART d/b/a SEXART,<br>     Plaintiffs,<br><br>vs.<br><br>Sagan Limited, a Republic of Seychelles company, individually and d/b/a Porn.com; MXN Ltd., a Barbados company, individually and d/b/a Porn.com; Netmedia Services Inc., a Canadian company, individually and d/b/a Porn.com; David Koonar, an individual; and John Does 1-20,<br>     Defendants. | Case No. CV-16-1494-PHX-DGC<br><br>**DEFENDANTS MXN LTD. AND SAGAN LIMITED'S REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**<br><br>ORAL ARGUMENT REQUESTED |

MXN (CyberWeb) and Sagan's Reply Brief in Support of Motion to Dismiss

"Mr. Tucker's anecdotal observations cannot support the sweeping claim for which they are being offered.… [E]ven if Mr. Tucker were qualified to attest to this, his opinions are far too speculative to be admissible.… [T]here is no evidence to substantiate that Defendants, or their agents or employees, had any involvement in these particular uploads."
- The Hon. Ursula Ungaro, *Hydentra HLP, Int., Ltd. v. Luchian*, 2016 WL 5951808, *11-12 (S.D. Fla. June 2, 2016)

In case after case, Plaintiffs have proffered the wholly inadmissible testimony of their outside consultant, Jason Tucker, who offers what can only be categorized as wild speculation concerning the operation of websites to which he has no personal knowledge whatsoever.  Mr. Tucker is not an expert and (even if he were), he has no knowledge (personal or otherwise) concerning the operation of the Porn.com website.  What Mr. Tucker *does* have is a well-documented bias and an apparent willingness to utilize legal process simply as a means to his ends.  In one interview, on the topic of websites that allegedly contain infringing materials, Mr. Tucker stated flatly: "So, we formed this organization and we're going to go hurt some people with the legal system, and it's going to be costly for them.  And we've got the money to go fight them and fight them to the death."  Declaration of Matthew Shayefar ["Shayefar Decl."], filed herewith, Ex. 1.

Indeed, Mr. Tucker's declaration here – and Plaintiffs' entire case in support of personal jurisdiction – is little more than speculation piled upon speculation.  For example, Plaintiffs rely heavily on statistics from a company called SimilarWeb (cited in Mr. Tucker's declaration), that purports to provide information concerning the number and location of visitors to a website.  What Mr. Tucker (and Plaintiffs) fails to tell this Court is that SimilarWeb itself admits that its numbers are nothing more than an estimation and an estimation that does not even include mobile devices or tablets.

1    In the end, Plaintiffs' Opposition to CyberWeb and Sagan's Motion to Dismiss
2 consists primarily of three things: (1) Mr. Tucker's wild, unsupported (and incorrect)
3 speculation concerning the operation of the Porn.com website and the Defendants'
4 operations; (2) Plaintiffs' exaggerations about their own connections to the United States
5 (relevant, of course, for purposes of an "express aiming" analysis); and (3) Plaintiffs'
6 tantrum-like insistence that they are entitled to prevail in *this* case simply because the
7 Court found jurisdiction to be proper in another case brought by different plaintiffs
8 involving different facts.  What Plaintiffs' Opposition lacks is a legitimate basis for an
9 exercise of personal jurisdiction over either Sagan Limited ("Sagan"), a Republic of
10 Seychelles company, or MXN Ltd. ("CyberWeb"), a Barbados company.  In further
11 support of their Motion to Dismiss, Sagan and CyberWeb state as follows.

12   **I.   Jason Tucker's Declaration Should be Disregarded by the Court.**

13    It is difficult to know where to start in addressing the myriad of problems with Mr.
14 Tucker's declaration, which is replete with speculation and surmise, based on
15 "information" outside of his actual knowledge, attempting to justify unsupportable (and
16 flat-out incorrect) conclusions.  And, although it would be impossible to address each of
17 the problems contained in Mr. Tucker's declaration within the space limitations of a reply
18 brief, Defendants address some of the most alarming problems, below.  The result is that,
19 given Mr. Tucker's declaration is essentially fact-free, Plaintiffs have presented no
20 evidence whatsoever to justify this Court's exercise of jurisdiction over Defendants.
21
22

A. Mr. Tucker's "Conclusions" Concerning the Identities of the Uploaders of the Uploaded Videos is Without Any Basis in Fact.

Just as he did in *Hydentra HLP, Int., Ltd. v. Luchian*, 2016 WL 5951808 (S.D. Fla. June 2, 2016) – where Judge Ungaro rejected his conclusions as "far too speculative to be admissible" – Mr. Tucker submits to the Court, as "readily obvious" fact, his conjecture about how the four allegedly infringing videos were uploaded to the Porn.com website. The Court need only parse Mr. Tucker's own assertions to reach the conclusion, as Judge Ungaro did, that "there is no evidence to substantiate that Defendants, or their agents or employees, had any involvement in these particular uploads." *Id.*, at *12.

Mr. Tucker states that the allegedly infringing videos in question are "exactly the same as four videos unlawfully displayed on xvideos.com, another well known pirate adult web site." Tucker Decl., ¶ 14. In particular, Mr. Tucker is taken with the fact that the upload times on both sites are the same and, from this, he concludes that Defendants must have (somehow – Mr. Tucker does not explain how) copied the videos from the xvideos.com website to the Porn.com website. *Id.* Even if this theory actually made sense (and it does not, as presumably if someone working for Sagan or CyberWeb copied a video from another website and then posted it on Porn.com, such a video would show a different upload time), and even if Sagan and CyberWeb had not already submitted sworn declarations denying any such copying and uploading (declarations which, unlike Mr. Tucker's, are based on personal knowledge and not speculation), Mr. Tucker's random speculation about how the allegedly infringing videos ended up on the Porn.com website is just that: random speculation that cannot be credited by the Court.

1    Indeed, a much more plausible explanation for the phenomenon observed by Mr,
2    Tucker (as was previously discussed in the Motion) is that the videos were uploaded by
3    users utilizing mass posting software.[1]  Richardson Decl., D.E. 35-2, ¶ 63.  Mr. Tucker
4    attempts to explain-away this alternate theory, claiming that the videos must have been
5    posted by Defendants because, when he visited Porn.com, he could not access any user
6    information associated with the uploaders of the videos.  From this, Mr. Tucker
7    concludes (erroneously) that (a) the person who uploaded the video could not have been a
8    Porn.com member, and (b) no information concerning the uploader exists.  Both
9    conclusions reflect only the fact that Mr. Tucker, again, has absolutely no knowledge
10   whatsoever about what information is contained in the Porn.com databases.

11       First, if a member's account is terminated, it is entirely possible that a video he
12   uploaded previously would remain on the website, and even state that he uploaded the
13   video, but his user profile page would state that his account does not exist.  *See* Reply
14   Declaration of Kristen Richardson ["Richardson Rep. Decl."], filed with Mr. Koonar's
15   Reply, ¶¶ 12-14.  Second, the fact that the Porn.com website does not display information
16   concerning an uploader to the general public does *not* mean such information does not
17   exist in the Porn.com database.  *Id.*, ¶ 15.  Mr. Tucker's assertion to the contrary is
18   nothing short of absurd.  The fact that Facebook might not display a user's email address
19   to the general public does not mean that Facebook does not possess that information.

---

[1] Mass posting software is not, by any means, obscure.  Individuals use such software all the time to post pictures or status updates to multiple social networks (Facebook, Twitter, Instagram, etc.) all at the same time.

And, in the end, the person with *actual knowledge* has stated emphatically that "neither CyberWeb nor Sagan nor anyone on their behalf uploaded the videos that are the subject of the complaint in this matter." Richardson Decl., D.E. 35-2, ¶ 64. Mr. Tucker can spin science fiction theories as much as he likes, but the Plaintiffs cannot use such fantasies to defeat Defendants' properly-supported Motion to Dismiss.

### B.  Mr. Tucker's Reliance on SimilarWeb Data is Misplaced.

Mr. Tucker (and Plaintiffs) make much of statistics from a third-party website that purports to report the number and location of visitors to a website. Mr. Tucker's (and Plaintiffs') reliance on SimilarWeb's statistics is misplaced. First, Mr. Tucker himself has no connection to SimilarWeb and cannot speak to SimilarWeb's methodology. As such, he can say nothing with any personal knowledge other than telling the Court that he typed "porn.com" into SimilarWeb's website and these are the figures that it returned to him without knowledge of how the information was gathered. And, in truth, SimilarWeb concedes that its statistics are really nothing more than an "estimate" (a/k/a "a guess") based not on actual traffic to a website (since they have no way of knowing what traffic a website receives unless the website provides its own data,[2] which Porn.com does not), but rather on estimations and extrapolations from small sample sizes of users.[3] Indeed, one

---

[2] Shayefar Decl., Ex. 2 ("SimilarWeb's website analytics is an estimation.… Connecting your Google Analytics with SimilarWeb assures your website is best represented on SimilarWeb – taking into account not only desktop traffic, but also traffic from mobile and tablet."). Therefore, SimilarWeb does not even take into account traffic from mobile and tablet devices, the most commonly used devices outside of the United States.

[3] Shayefar Decl., Ex. 3 ("SimilarWeb, the third-party site which was the source of the incorrectly reported Guardian traffic figures, estimates site data using information from a panel of web surfers who have volunteered to install a browser plugin.").

study that compared SimilarWeb to various websites' actual analytics found that SimilarWeb has up to a 30% error rate in 22% of cases and *a larger error rate in the rest*. Shayefar Decl., Ex. 4.[4]  In short, Plaintiffs are asking this Court to base a determination of Defendants' constitutional right to Due Process on statistics from a website that admits it provides only estimates of website traffic and which has proven to be far from reliable.[5]

      C.      <u>Mr. Tucker Appears to Have Failed Logical Reasoning in High School</u>

In his declaration, Mr. Tucker points to the Declaration that Philip Bradbury submitted in the *AMA* case.  In that case, the Plaintiff, AMA, was a content partner of GIM.  In explaining the watermark system used on Porn.com – as it was relevant to that case – Mr. Bradbury stated: "Beginning in 2012, Netmedia implemented a review process under which user-posted content on Porn.com is reviewed for watermarks indicating that such content is to owned by Porn.com partners, such as AMA."  *AMA MultiMedia LLC v. Sagan Limited*, Case No. CV-16-1269-PHX-DGC, D.E. 72-1, ¶ 2 (D. Ariz.).  In *AMA*, this was relevant to Defendants' arguments concerning the applicability of the Content Partner Revenue Sharing Agreement, which is not at issue here.

Nevertheless, Mr. Tucker reaches the astonishing conclusion that – because Mr. Bradbury spoke about the watermark system reviewing the watermarks of content partners in *AMA* – this must mean that the watermark system ***only*** looks for the

---

[4] Admittedly, according to this study, SimilarWeb performed better than other websites offering similar services, but "better" is apparently a relative term, given the results.
[5] And if the Court *were* to take SimilarWeb's statistics into account, they show that approximately 53% of traffic to Porn.com is "referral" traffic (i.e. sent from other websites) and 26% is organic search traffic.  None of this shows that Defendants target the U.S., just that users end up on Porn.com through means not controlled by Defendants.

watermarks of content partners.  This is an absurd – and erroneous – conclusion that is directly contradicted by Mr. Bradbury's declaration in this case.  Bradbury Decl., D.E. 36-1, ¶¶ 43-44.  The mere fact that the Porn.com website detects the watermarks of one group of content producers does not mean that it does not also do so for another group.

### D. Mr. Tucker's Assumptions About Payment Processors are Incorrect.

Here, too, Mr. Tucker either misunderstands modern commerce or he is deliberately attempting to mislead the Court.  Either way, his assertions cannot be credited.  Mr. Tucker states that he purchased a Porn.com membership and that the payment was "processed through Epoch Payment Solutions, based in California."  Tucker Decl., ¶ 26.  Mr. Tucker claims, further, that an email he received from Epoch supports his assertion that the payment was processed in the U.S.  *Id.*, at ¶ 27 and Ex. D.  The cited email says no such thing and, indeed, this is yet another instance of Mr. Tucker simply making things up that are outside his knowledge and claiming it as fact.  In a declaration, the payment processor itself sets the record straight: "Since 2008 the Porn.com website has been under accounts that have contracted with Epoch EU....  The payment for Membership ID 1850418284 to the Porn.com website [Mr. Tucker's membership] was processed through Epoch EU."  Declaration of Esther Martinez, filed herewith, ¶¶ 2-3.  This is, of course, what Defendants have maintained in *their* declarations as well.  *See* Richardson Decl., D.E. 35-2, ¶¶ 15-17; Bradbury Decl., D.E. 36-1, ¶¶ 20-22.

### E. Mr. Tucker Presents Unsupportable Conclusions Concerning CDNs.

Plaintiffs also try to mislead the Court regarding the purpose of a Content Delivery Network (CDN).  First, and as detailed in the Motion, neither Cyberweb nor Sagan have

any direct relationship with Limelight but instead receive managed hosting from Viking Host, which chose to subcontract CDN services to Limelight. Richardson Repl. Decl., ¶ 19. But even if Porn.com is ultimately served through Limelight's CDN, this does not indicate any intention by Defendants to direct the website at the U.S. because Limelight's CDN is not directed at the U.S., but the entire world. Limelight's network boasts 49 network locations around the world, with 37 of them outside of the U.S. Shayefar Decl., Ex. 5. Limelight's corporate brochure does not reference the U.S. *even once*, but uses the words "world" or "worldwide" 17 times and the words "globe" or "global" 14 times. *Id.*, Ex. 6. Limelight explicitly markets itself as a company that provides worldwide connectivity – not just for the U.S., even using the corporate motto "The world is digital. We deliver it." *Id.* Limelight's website boasts case studies where it has helped Australia's largest newspaper and French video network. *Id.*, Exs. 7-8. There is nothing about the use of Limelight (even if Defendants directly engaged or chose Limelight, which they did not) that indicates an intention to direct the Porn.com website at the U.S.

### F. Vast Swaths of Mr. Tucker's Declaration Are Simply Made Up.

Mr. Tucker's declaration is replete with assertions for which he cannot possibly have any factual basis (certainly he provides the Court with none), which are outside his personal knowledge, and yet which he proffers to the Court as fact. *See, e.g.*, Tucker Decl. ¶ 34 ("The United States has the most expensive advertising rates in the world."); ¶ 35 ("The United States is the most profitable market in the world for adult entertainment web sites, earning their revenues from advertising."); ¶ 37 ("The U.S. is one of the most profitable markets, if not the most profitable market for Porn.com, as the U.S. has the

1    highest amount of traffic coupled with some of the most expensive advertising rates.").

2         G.   Mr. Tucker's Other False Statements.

3    Mr. Tucker claims Defendants are directly connected to U.S. content producers
4    and streaming websites. Tucker Del., ¶ 38. But as explained in the Motion, the Content
5    Partnership Program referenced by Mr. Tucker is operated by GIM, not Cyberweb or
6    Sagan. Richardson Decl., D.E. 35-2, ¶ 46. Mr. Tucker also claims that there is at least
7    one instance where Defendants have a direct advertiser relationship with a U.S. entity.
8    Tucker Decl., ¶ 40. But Defendants do not have a direct advertising relationship with
9    ICF Technology, Inc. Richardson Rep. Decl., ¶ 18. Finally, Defendants do not know
10   what the illegitimate-looking document is that Mr. Tucker attached as Exhibit E to his
11   Declaration, but Cyberweb, as detailed in the Motion, does not conduct its business
12   "primarily in the USA." Cyberweb did not instruct any registering agent to indicate that
13   its business would be in the U.S. Richardson Rep. Decl., ¶ 17. Cyberweb's Articles of
14   Incorporation certainly do not contain any reference to the U.S. *Id.*, Ex. B. Mr. Tucker's
15   declaration begins, as all declarations must, with an assertion that his declaration is
16   "based upon personal knowledge." Mr. Tucker's declaration clearly is *not* and that is not
17   something that should be taken lightly in assessing Plaintiffs' submissions to this Court.

18   **II.   Plaintiffs Exaggerated Their Ties to the United States.**

19       It is somewhat amusing to watch as Plaintiffs try to run quickly and as far as
20   possible from their actual country of incorporation, Cyprus. Plaintiffs' citizenships are,
21   of course, important because Plaintiffs have claimed that jurisdiction may be based on the
22   *Calder* effects test, arguing that Defendants engaged in "express aiming" towards the

United States because Plaintiffs operate in the United States.[6]  It would appear that Plaintiffs' connections to the United States, however, are somewhat overstated.

While Plaintiffs list a United States address on their copyright registrations with the US Copyright office, 18034 Ventura Blvd, Suite 181 in Encino, California (Shayefar Decl., Ex. 9), that location is nothing but a maildrop belonging to "Encino Mail & More":



Shayefar Decl., ¶¶ 11-13.

Surprisingly, despite Plaintiffs' assertion that they carry on business in California, the California Secretary of State does not list any domestic or foreign corporation in California operating under the name Hydentra.  *Id.*, ¶ 14 and Ex. 12.  Searches in Arizona and Nevada similarly show no results .  *Id.*, ¶¶ 15-16 and Exs. 13-14.

There are, however, two entities registered in Delaware: Hydentra, L.P. and Hydentra LLC.  Hydentra L.P. had its registration cancelled in 2011 for failure to pay taxes and Hydentra LLC was voluntarily cancelled in 2003.  *Id.*, Exs. 15-16.  Another entity, HLP General Partner, Inc. was registered in Texas, but had its registration forfeited in 2010 for failure to pay taxes.  *Id.*, Ex. 17.  The *only* evidence that Plaintiffs provide, then, to demonstrate their connections to the U.S. is Mr. Krogman's Declaration, which vaguely asserts connections without providing documentation or any specifics.

---

[6] One might reasonably wonder why Plaintiffs don't simply change their place of incorporation to the United States if they truly operate primarily from the U.S.

### III. Plaintiffs Misunderstand the Concept of Specific Jurisdiction and *Mavrix*.

Finally, Plaintiffs' repeated refrain – that the Court somehow *must* find jurisdiction in *this* case because it found jurisdiction over Sagan in a separate case, involving different plaintiffs and different facts – suggests a profound misunderstanding about the difference between general and specific jurisdiction. In essence, Plaintiffs are insisting that this Court's finding of specific jurisdiction in the *AMA* case is really a finding of general jurisdiction. It is not. The Court's findings in the *AMA* case involved a United States plaintiff, in a case where a variety of that plaintiffs' factual assertions went unopposed because Defendants, there, chose to focus instead on a choice of law provision in a contract not at issue here.

These differences also differentiate this case from the *Mavrix* case the Court relied on in *AMA*. *Mavrix* is inapposite because, unlike in *Mavrix*: (1) Defendants did not upload the infringing content or engage in any other intentional act,[7] (2) Defendants have not "continuously and deliberately exploited" the United States market, (3) exercise of jurisdiction would be unreasonable and (4) there was no harm suffered in the forum. In fact, Plaintiffs proffer no real evidence that they suffered any actual damages whatsoever from the alleged infringement, let alone damages in the United States. In sum: The parties are different; the facts are different; the legal arguments are different; and the result should be different as well. This Court should grant the Motion to Dismiss.

---

[7] Operating a user-generated content website is not an "intentional act" of copyright infringement if those users engage in copyright infringement. *See*, *e.g.*, *CoStar Group, Inc. v. Loopnet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2014).

Respectfully submitted,

| | |
|---|---|
| /s/ Valentin D. Gurvits | /s/ Evan Fray-Witzer |
| Valentin D. Gurvits (*Pro Hac Vice*) | Evan Fray-Witzer (*Pro Hac Vice*) |
| Matthew Shayefar (*Pro Hac Vice*) | CIAMPA FRAY-WITZER, LLP |
| BOSTON LAW GROUP, PC | 20 Park Plaza, Suite 505 |
| 825 Beacon Street, Suite 20 | Boston, Massachusetts 02116 |
| Newton Centre, Massachusetts 02459 | Telephone: (617) 426-0000 |
| Telephone: (617) 928-1806 | Facsimile: (617) 423-4855 |
| Facsimile: (617) 928-1802 | Evan@CFWlegal.com |
| vgurvits@bostonlawgroup.com | |
| matt@bostonlawgroup.com | |

*Attorneys for Defendants CyberWeb, Ltd. (previously known as MXN Ltd.) and Sagan Limited*

### Certificate of Service

I hereby certify that on May 2, 2017, I electronically submitted the above document to the Clerk of the United States District Court, District of Arizona, using the online e-filing system.

/s/ Matthew Shayefar, Esq.
Matthew Shayefar, Esq.