# BOSTON LAW GROUP, PC
### ATTORNEYS AT LAW

825 BEACON STREET, SUITE 20
NEWTON CENTRE, MASSACHUSETTS 02459

Main (617) 928-1800

Fax (617) 928-1802

**Via ECF**

May 23, 2017

Courtroom Deputy Clerk
U.S. District Court, District of Arizona
Sandra Day O'Connor U.S. Courthouse, Suite 623
401 West Washington Street, SPC 58
Phoenix, AZ 85003-2156

> **Re:** **Hydentra HLP Int. Ltd. v. Sagan Limited et al**
> **U.S. Dist. Crt. D. Ariz., Case No. CV-16-1494-PHX-DGC**

Dear Clerk:

Defendants in the above referenced case hereby provide notice of the following citations of supplemental authorities in connection with their Motions to Dismiss (Docket Nos. 35, 36 and 37):

1.  *ALS Scan, Inc. v. Cloudfare, Inc.*, Civ. 16-5051-GW (C. D. Cal. May 4, 2017), a copy of which is attached hereto as **Exhibit 1** (including the referenced tentative rulings issued on February 27, 2017 and April 13, 2017).  In *ALS Scan, Inc.*, the Federal District Court for the Central District of California found that – in circumstances almost identical to those presented here – the Court lacked personal jurisdiction over the foreign defendants under Rule 4(k)(2).  In so concluding, the Court applied the standard articulated by the Court in *Mavrix Photo v. Brand Techs.*, 647 F. 3d 1218 (9th Cir. 2011).

2.  *NuboNau, Inc. v. NB Labs, Ltd.,* 2012 WL 843503 (S.D. Cal. March 9, 2012), a copy of which is attached hereto as **Exhibit 2**.  The *Nubonau, Inc.* decision stresses that, under the purposeful direction test, contacts that do not arise out of the allegedly infringing activity are not relevant to the jurisdictional analysis.

Very Truly Yours,

Matthew Shayefar, Esq.

# Exhibit 1

Case 2:16-cv-01404-DGC Document 57 Filed 05/23/17 Page 3 of 35

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 16-5051-GW(AFMx) | Date | May 4, 2017 |
|---|---|---|---|
| Title | *ALS Scan, Inc. v. Cloudflare, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Katie Thibodeaux | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Jay M. Spillane | Rachel H. Kassabian |
| | Mark T. Gray |
| | Raymond Paul Katrinak |

**PROCEEDINGS:**     **CLOUDFLARE, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING EXTRATERRITORIALITY [121];**

**DOLPHIN MEDIA, LTD.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION [93]**

Court hears further argument as to Defendant Cloudflare, Inc.'s motion for partial summary judgment. For reasons stated on the record, Defendant's motion is continued to May 18, 2017 at 8:30 a.m. Counsel will contact the clerk by May 16 whether the appearance on May 18 will be required.

Argument is held as to Defendant Dolphin's motion to dismiss. Based on the Tentative Rulings issued on February 27, 2017 and April 13, 2017, Defendant Dolphin's motion is GRANTED for lack of personal jurisdiction.

|  | : | 50 |
|---|---|---|
| Initials of Preparer | JG | |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 16-5051-GW(AFMx) | Date | April 13, 2017 |
|---|---|---|---|
| Title | *ALS Scan, Inc. v. Cloudflare, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Sandra MacNeil | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Jay M. Spillane | Rachel H. Kassabian - by telephone |
| | John L. Ambrogi - by telephone |

PROCEEDINGS:     **CLOUDFLARE, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING EXTRATERRITORIALITY [121];**

**STATUS CONFERENCE**

The Court's Ruling following Supplemental Briefing re Dolphin Media, Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction [93] is circulated and attached hereto. For reasons stated on the record, Defendant Dolphin's Motion is placed back on calendar for May 4, 2017 at 8:30 a.m.

Defendant Cloudflare's Motion for Partial Summary Judgment is continued to May 4, 2017 at 8:30 a.m. Plaintiff will have until April 20, 2017 to file its offer of proof. Defendant will respond by April 27, 2017.

|  | : | 06 |
|---|---|---|
| Initials of Preparer | JG | |

Case 2:16-cv-01404-DGC Document 57 Filed 05/23/17 Page 5 of 35

*ALS Scan, Inc. v. Cloudflare, Inc., et al.*, Case No. CV-16-5051-GW (AFMx)
Ruling following Supplemental Briefing re Dolphin Media, Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction

On February 27, 2017, the Court issued a Tentative Ruling and held a hearing regarding Defendant Dolphin Media Limited's ("Dolphin") Motion to Dismiss for Lack of Personal Jurisdiction, for Improper Venue, or in the Alternative, Forum Non Conviens. *See* Tent. Ruling, Docket No. 117. The Court held that Plaintiff had failed to establish a prima facie case of general or specific jurisdiction over Dolphin in California, but allowed Plaintiff to submit supplemental briefing regarding whether Dolphin has sufficient contacts with the United States as a whole to warrant the exercise of specific jurisdiction under Federal Rule of Civil Procedure 4(k)(2). *Id.* at pages 9-10. Now pending before the Court are the parties' supplemental briefs. *See* Pl.'s Supp'l Br., Docket No. 138; Dolphin's Supp'l Br., Docket No. 158.

Under Rule 4(k)(2),"[e]ven in the absence of a federal statute authorizing nationwide service, foreign defendants who are not otherwise subject to jurisdiction in any state but who have contacts *with the nation as a whole* ('national contacts') are subject to personal jurisdiction on *claims arising under federal law*." Schwarzer, Tashima, et al., Cal. Prac. Guide Fed. Civ. Proc. Before Trial (2016) § 3:33:5, at 3-15 (citing Fed. R. Civ. Proc. 4(k)(2); *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006); *Holland Am. Line Inc. v. Wartsila North Am., Inc.*, 485 F.3d 450, 461 (9th Cir. 2007); *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico*, 563 F.3d 1285, 1297-98 (Fed. Cir. 2009)). To "establish personal jurisdiction based on a defendant's aggregated national contacts, plaintiff must prove three factors: the defendant is not subject to the personal jurisdiction of any state court of general jurisdiction; the claim arises under federal law; and the federal court's exercise of personal jurisdiction comports with due process." *Id.* § 3:35:5b, at 3-16 (internal quotation marks and citations omitted).

"The due process analysis under Rule 4(k)(2) is nearly identical to the traditional personal jurisdiction analysis with one significant difference: rather than considering contacts between the defendants and the forums state, we consider contacts with the nation as a whole." *See Pebble Beach*, 453 F.3d at 1155 (internal quotations and citations omitted). As discussed in the Court's Tentative Ruling, the Ninth Circuit utilizes the following three-prong test to analyze

whether specific jurisdiction[1] exists, of which Plaintiff bears the burden of establishing the first two prongs: (1) whether Dolphin purposefully directed its activities at the forum or purposefully availed itself of the privilege of conducting activities in the forum; (2) whether Plaintiff's claims arise out of Dolphin's forum-related activities; and (3) whether the exercise of jurisdiction is reasonable. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

Where a defendant "has alleged copyright infringement, a tort-like cause of action, purposeful direction 'is the proper analytical framework'" in determining whether jurisdiction exists. *Mavrix Photo v. Brand Techs.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (quoting *Schwarzenegger*, 374 F.3d at 802). Thus, whether nationwide jurisdiction exists "depends on whether [Dolphin's infringing] actions were purposefully directed at the [United States]." *Id.* at 1159; *see also Pebble Beach*, 453 F.3d at 1159 ("Even if [plaintiff] is unable to show purposeful direction as to California, [plaintiff] can still establish jurisdiction if [defendant] purposefully directed his action at the United States."). Purposeful direction is analyzed pursuant to the "effects" test outlined in *Calder v. Jones*, 465 U.S. 763 (1984), which "requires that 'the defendant allegedly must have (1) committed an intentional act, (2) ***expressly aimed*** at the forum state, and (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *See Mavrix Photo*, 647 U.S. at 1228 (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010)) (emphasis added).

In its Supplemental Brief, Plaintiff contends that Dolphin maintains the following contacts with the United States, which purportedly establish that it expressly aims its infringing acts at the United States:

- Dolphin maintains an interactive website named "imgchili.net" that allows customers worldwide, including U.S. customers, to register for an account.

- Imgchili.net account holders may sign up to receive their payments from Dolphin[2] through PayPal, a company headquartered in California.

- The imgchili.net website is retrieved from storage servers that are maintained by

---

[1] Plaintiff has not attempted to establish that Dolphin is subject to general jurisdiction within the United States, nor would it succeed on such an argument based on the proffered contacts Dolphin maintains with the United States. *See Holland Am. Line*, 485 F.3d at 462 (requiring "extensive contacts" with the United States to warrant general jurisdiction under Rule 4(k)(2)).

[2] As explained by Plaintiff, Dolphin pays account holders for page views of images uploaded by those account holders to imgchili.net, including infringing copyrighted material. *See* Pl.'s Supp'l Br. at 1:9-13.

- Cloudflare, a company headquartered in California.
- Imgchili.net enables account holders to upload content stolen form U.S. copyright owners, including Playboy, Penthouse, Hustler, and Plaintiff.
- The imgchili.net website is entirely in English.
- Dolphin pays account holders for page views in amounts denominated by U.S. dollars.
- Dolphin pays the most amount of money – $4.50 per 1,000 page views – for page views that occur in countries listed in "Zone A"; Zone A countries include the United States, Australia, Canada, New Zealand, and the United Kingdom.
- Dolphin purportedly seeks "the protection of U.S. laws" because it utilizes a copyright reservation that states the following: "Copyright © 2011-2017 imgchili."
- Imgchili.net's "Abuse" page instructs parties notifying Dolphin of infringement that their infringement notifications must contain certain elements, which are also elements required under the Digital Copyright Millennium Act ("DCMA"), 17 U.S.C. § 512(c)(3).
- According to a technology service that provides statistics indicating the number of website visits a given website receives from each country, the United States accounts for 10% of the total visits to imgchili.net.

*See* Pl.'s Supp'l Br. at 1:6-4:16; *see also* Decl. of Eric Penn ("Penn Decl."), Docket No. 139.

Plaintiff asserts that the above contacts establish that "Dolphin is targeting its operations purposely toward the U.S. market," thereby warranting the exercise of nationwide jurisdiction over Dolphin. *See* Pl.'s Supp'l Br. at 6:12-14. Dolphin, in contrast, asserts that none of the above contacts indicate that Dolphin expressly aims its acts at the United States. The Court would agree with Dolphin.

With respect to Dolphin's use of services provided by companies that are headquartered in California, as the Court explained in its Tentative Ruling, this theory has been expressly rejected by the Ninth Circuit. *See* Tent. Ruling at page 8. Indeed, it is unclear how Dolphin's use of these companies' services is related to whether Dolphin expressly aims its acts at the United States – for example, there is no indication that Dolphin uses PayPal and Cloudflare because its use of U.S. companies draws more pages views from individuals located in the

United States.  *Cf. Mavrix Photo*, 647 F.3d at 1230 (holding that website specifically targeted California because it utilized advertisements targeting California residents and focused on the California-centered celebrity and entertainment industries).

In addition, as Dolphin points out, the fact that imgchili.net is in English and advertises payment amounts in U.S. dollars does not show that Dolphin expressly aims its infringing acts at the United States.  *See* Dolphin's Supp'l Br. at 5:9-23; *see also Mavrix Photo*, 647 F.3d at 1229 (maintaining a website that is accessible in the forum is not sufficient to establish express aiming; a plaintiff must show "something more" indicating that the defendant purposefully targeted its infringing acts at the forum).  Indeed, as Dolphin points out, English is the official language of 67 countries and 27 non-sovereign entities, including Hong Kong, where Dolphin is headquartered.  *See* Decl. of Tomas Mazal ("Mazal Decl.") ¶ 5, Docket No. 158-1.  Similarly, the U.S. dollar is widely used as currency around the world, and does not establish that Dolphin utilizes the U.S. dollar to attract account holders based in the United States.  *See* Mazal Decl. ¶ 5.

For similar reasons, Dolphin's inclusion of the United States in the category of "Zone A" companies for which Dolphin pays more per page view does not establish that it specifically targets the United States over the other countries listed in Zone A.  *See Pebble Beach*, 453 F.3d 1151, 1157 (9th Cir. 2006) (requiring "individualized targeting" indicating that "the defendant purposefully directed its activity in a substantial way to the forum").  Moreover, there is no evidence that Dolphin has actually paid any account holder for page views of *infringing* images in the United States.  *See NuboNau, Inc. v. NB Labs, Ltd.*, 10cv2631-LAB (BGS), 2012 WL 843503, at *11-12 (S.D. Cal. Mar. 9, 2012) (explaining that under purposeful direction test, contacts that do not arise out of infringing activity are not relevant to the analysis); *Pebble Beach*, 453 U.S. at 1160 ("[A]lthough [defendant] may serve [U.S. citizens], there is not a scintilla of evidence indicating that this patronage is related to either [defendant's] choice of a[n infringing] domain name or the posting of a passive website [under that domain name].").

In addition, Plaintiff's proffered evidence that imgchili.net receives 10% of its Internet traffic from the United States does not indicate that Dolphin individually targets the United States.  Indeed, the evidence proffered establishes that imgchili.net receives 20% of its Internet traffic from Japan, 10.4% from the United States, 10.4% from Germany, and various proportions under 10% from 27 other countries.  *See* Penn Decl. Ex. 6, Docket No. 139-6.  Plaintiff provides no authority indicating that merely receiving a portion of Internet traffic from the United States

indicates that a website individually targets the United States. *Cf. Pebble Beach*, 453 F.3d at 1157 (requiring that defendant direct its activity "in a substantial way to the forum").

Finally, Plaintiff's contention that Dolphin avails itself of the protection of United States copyright laws by utilizing the reservation "Copyright © 2011-2017 imgchili" is not supported by the record. Plaintiff provides no evidence that imgchili.net's copyright is a reservation of rights under United States copyright laws, rather than any other country; indeed, as Dolphin points out, Hong Kong has its own copyright statute, and the "©" symbol is not exclusive to the United States. *See* Mazal Decl. ¶ 7; *see also* Mot. to Dismiss Ex. D, Docket No. 93-7 (Hong Kong copyright statute). The mere fact that Dolphin uses a copyright symbol also utilized in the United States does not establish that it directs its actions there. *See Pebble Beach*, 453 F.3d at 1159 (holding that the use of a website ending in ".com," a domain ending affiliated with the United States, does not establish that a website's primary target is the United States).

Notably, Plaintiff provides no authority supporting its contention that the contacts proffered in its Supplemental Brief are sufficient to confer nationwide jurisdiction. In any event, based on the governing legal authority, the Court would find that the proffered contacts are not sufficient. *See NuboNau, Inc.*, 2012 WL 843503, at *12 (S.D. Cal. Mar. 9, 2012) (refusing to exercise nationwide jurisdiction where there was no evidence that defendant's infringing acts were purposefully directed at United States, emphasizing that "[j]ust because a foreign act has foreseeable effects in a forum state does not mean specific jurisdiction there is appropriate"); *Schwarzenegger*, 374 F.3d at 803 ("It may be true that [defendant's] intentional act eventually caused harm to [plaintiff] in California, and [defendant] may have known that [plaintiff] lived in California. But this does not [establish express aiming at California]."); *cf. Mavrix Photo*, 647 F.3d at 1229 (finding purposeful direction where defendant "used [plaintiff']s copyrighted photos as part of its exploitation of the [forum] market for its own commercial gain"); *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico*, 563 F.3d 1285, 1297-98 (Fed. Cir. 2009) (finding specific jurisdiction in the United States warranted under Rule 4(k)(2) based on defendant's intentional copying and distributing of infringing games to thousands of U.S. customers, resulting in its exploitation of the United States market for commercial game and harm to the United States copyright holder).

The Court would therefore GRANT Dolphin's Motion to Dismiss for Lack of Personal Jurisdiction.

**Dolphin's Evidentiary Objections, Docket No. 158-2**

1. Sustained
2. Sustained
3. Sustained
4. Sustained
5. Sustained
6. Sustained
7. Sustained
8. Sustained
9. Sustained
10. Sustained
11. Sustained
12. Sustained
13. Sustained
14. Overruled
15. Overruled
16. Overruled
17. Overruled
18. Overruled
19. Overruled
20. Overruled

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 16-5051-GW(AFMx) | | Date | February 27, 2017 |
|---|---|---|---|---|
| Title | *ALS Scan, Inc. v. Cloudflare, Inc., et al.* | | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Jay M. Spillane | R. Paul Katrinak |
| | Robert Carreon |
| | Rachel H. Kassabian |
| | John L. Ambrogi - by telephone |

**PROCEEDINGS:**    **DEFENDANT DOLPHIN MEDIA LIMITED'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, FOR IMPROPER VENUE, OR IN THE ALTERNATIVE FORUM NON CONVENIENS [93];**

                  **SCHEDULING CONFERENCE**

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. Plaintiff will have until March 13, 2017 to submit an offer of proof regarding nationwide jurisdiction. The Court will issue its ruling by March 20, 2017. If the offer of proof raises a possibility that jurisdiction exists, the court will ask Defendant Dolphin to submit a response. If it does not raise a possibility, the Court will make the tentative its final.

The scheduling conference is continued to March 13, 2017 at 8:30 a.m. Parties will file a joint status report by noon on March 8, 2017.

| | | : | 10 |
|---|---|---|---|
| | Initials of Preparer | JG | |

___ALS Scan, Inc. v. CloudFlare, Inc., et al.___, Case No. CV-16-5051-GW-AFM
Tentative Rulings on Motions to Dismiss for Lack of Personal Jurisdiction, for Improper Venue, and/or for Forum Non Conveniens

## I. Background

ALS Scan, Inc. ("Plaintiff") sues CloudFlare, Inc. ("CloudFlare"); OVH SAS; Hebergement OVH Inc.; Dolphin Media Ltd. ("Dolphin"); Hivelocity Ventures Corporation; Steadfast Networks, LLC ("Steadfast"); and Does 1-10 (collectively, "Defendants") for various claims related to Defendants' alleged infringement of Plaintiff's copyrighted and trademarked works. *See generally* Second Am. Compl. ("SAC"), Docket No. 64. The SAC asserts six causes of action: (1) direct copyright infringement, against Dolphin and Does 1-5; (2) contributory copyright infringement, against all Defendants except Dolphin; (3) vicarious copyright infringement, against all Defendants except Dolphin; (4) direct trademark infringement, against Dolphin and Does 1-5; (5) direct trademark counterfeiting, against Dolphin and Does 1-5; and (6) contributory trademark infringement, against all Defendants except Dolphin. *Id.*

Plaintiff is a Maryland corporation with its principal place of business in Woodstock, Maryland. *Id.* ¶ 9. Plaintiff owns a library of copyrighted and trademarked works of adult entertainment. *Id.* ¶ 3. Plaintiff alleges that its works are repeatedly infringed by pirate Internet sites, which display Plaintiff's works without Plaintiff's permission. *Id.* ¶ 4. These sites are allegedly supported by third-party service providers that continue doing business with the sites even after receiving actual notice of infringement from Plaintiff. *Id.* ¶ 6.

The SAC alleges that Dolphin is a Hong Kong corporation with offices located in Hong Kong. *Id.* ¶ 12. Dolphin allegedly owns and operates imgchili.net, one of the pirate sites that display infringing copies of Plaintiff's works. *Id.* ¶ 44. The SAC alleges that Dolphin provides monetary incentives to induce members of imgchili.net to steal and upload large quantities of infringing content. *Id.* ¶ 46. Plaintiff has sent Dolphin infringement notifications on numerous occasions, but Dolphin refused to remove the images. *Id.* ¶ 45.

Plaintiff seeks actual damages; statutory damages; disgorgement of profits; attorneys' fees and costs; injunctive relief; and such other relief as the Court deems appropriate. *See* SAC at 18:21-19:5.

Now pending before the Court is Dolphin's Motion to Dismiss for Lack of Personal

Jurisdiction, Improper Venue, or alternatively, Forum Non Conveniens.  *See* Mot. to Dismiss ("MTD"), Docket No. 93.

## II. Motion to Dismiss for Lack of Personal Jurisdiction

### A. Legal Standard

"In personam jurisdiction, simply stated, is the power of a court to enter judgment against a person." *SEC v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007).  In filing a complaint, the plaintiff bears the burden of establishing the court's personal jurisdiction over a defendant.  *See Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).  The defendant may move to dismiss the case for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  When a district court acts on a defendant's motion to dismiss without holding an evidentiary hearing, the plaintiff "need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss."  *See Doe*, 248 F.3d at 922 (citing *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995)); *see also Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1130 (9th Cir. 2002).  Where not directly controverted, the plaintiff's version of the facts is taken as true, and any conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor.  *See Doe*, 248 F.3d at 922.  However, the court "may not assume the truth of allegations in a pleading which are contradicted by affidavit."  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).

Where there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits.  *See id.*  California permits "[a] court of [the] state [to] exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."  Cal. Civ. Proc. Code § 410.10.

"Due process permits the exercise of personal jurisdiction over a nonresident defendant in the following four situations: (1) where the defendant is domiciled in the forum state when the lawsuit is commenced; (2) where the defendant is personally served with process while physically present in the forum state; (3) where the defendant consents to jurisdiction; or (4) where the defendant has sufficient 'minimum contacts' with the forum state, such that the exercise of jurisdiction would not 'offend traditional notions of fair play and substantial justice.'" *Dole Food Co., Inc. v. Gutierrez*, No. CV039416 NM(PJWX), 2004 WL 3737123, *3 (C.D. Cal. July 13, 2004) (citing *Fitzgerald v. Wilson,* 39 Cal.App.4th 1419, 1425-26 (1995)).  "With respect to the fourth situation, courts may exercise either: (1) general jurisdiction, which arises

out of a defendant's 'continuous and systematic' contacts with the forum; or (2) specific jurisdiction, which arises where a defendant's specific contacts with the forum have given rise to the claim at issue." *Id.* (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984)).

General personal jurisdiction exists where a nonresident defendant's affiliations with the forum state are so "continuous and systematic as to render them essentially at home in the forum state." *Goodyear Dunlop Tires Operations, S.A., et al. v. Brown*, 594 U.S. 915, 919 (2011) (citing *Int'l Shoe Co.,* 326 U.S. at 317); *see also Daimler AG v. Bauman*, 134 S.Ct. 746, 749 (2014). Where general jurisdiction does not exist, the Ninth Circuit has established a three-factor test to determine whether the exercise of specific jurisdiction is appropriate:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)); *see also Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008). The plaintiff bears the burden on the first two prongs, *see Sher v. Johnson,* 911 F.2d 1357, 1361 (9th Cir. 1990), but the burden then shifts to the defendant to a make a "compelling case" that the exercise of jurisdiction would not be reasonable. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476-78 (1985). The "reasonableness" prong of the test for specific jurisdiction is examined according to the following factors:

> (1) the extent of purposeful interjection, (2) the burden on the defendant to defend the suit in the chosen forum, (3) the extent of conflict with the sovereignty of the defendant's state, (4) the forum state's interest in the dispute; (5) the most efficient forum for judicial resolution of the dispute; (6) the importance of the chosen forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 851 (9th Cir. 1993).

### B. *Analysis*

Dolphin asserts that there is no personal jurisdiction over it because it is a Hong Kong corporation headquartered in Hong Kong, and does not have sufficient contacts with California. *See* MTD at 1:2-12.

1. General Jurisdiction

Dolphin asserts that there is no general jurisdiction over it because Dolphin does not own property, hold offices, conduct or solicit business, hold bank accounts, or enter into contracts in California.  *See* MTD at 5:6-14; *see also* Decl. of Tomas Mazal ("Mazal Decl.") ¶¶ 17-28, Docket No. 93-2.  In addition, Dolphin contends that imgchili.net does not have any registered users located in California, and that neither Dolphin nor imgchili.net has sent payment to any individual or entity located in California.  *See* Mazal Decl. ¶ 24.  As a result, Dolphin asserts that it does not have any continuous or systemic contacts with California that would subject it to general jurisdiction.  *Id.* at 5:15-14.

In response, Plaintiff asserts that imgchili.net is an interactive website that enables customers worldwide, including California customers, to sign up for an imgchili.net account. *See* Opp'n to MTD ("Opp'n") at 1:5-12, Docket No. 105.  Plaintiff alleges that account holders can upload galleries of infringing images, including images uploaded from California servers, to imgchili.net.  *Id.*  In addition, imgchili.net allegedly pays account holders based on the number of page views of uploaded images using PayPal, a California-based company headquartered in San Jose, and also utilizes servers maintained by CloudFlare, a California-based company headquartered in San Jose.  *Id.*

The Court would find that these contacts are by no means "so extensive" that they render Dolphin subject to general jurisdiction.  *See Schwarzenegger*, 374 F.3d at 801.  Indeed, in *Schwarzenegger*, the Ninth Circuit held that a defendant's contacts with California, which included purchases of automobiles imported by California entities, regular retention of services from California-based companies, and maintenance of an Internet website that could be accessed by people residing in California, fell "well short of the 'continuous and systematic' contacts that the Supreme Court and [the Ninth Circuit] have held to constitute sufficient 'presence' to warrant general jurisdiction."  *Id.* (quoting *Helicopteros*, 466 U.S. at 418 ("mere purchases, even if occurring at regular intervals, are not enough" to establish general jurisdiction); *Bancroft & Masters, Inc. v. August Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000) (distinguishing "doing

business *in* California," which potentially could support general jurisdiction, from "doing business *with* California," which is not sufficient) (emphases added)). Dolphin is certainly not "essentially at home" in California. *See Goodyear Dunlop Tires Operations, S.A.*, 594 U.S. at 919.

The Court would therefore find that Plaintiff has failed to establish a prima facie case of general jurisdiction.

### 2. Specific Jurisdiction

As discussed *supra*, the Ninth Circuit utilizes a three-prong test to analyze specific jurisdiction; Plaintiff bears the burden of establishing the first two prongs. The three prongs include: (1) whether Dolphin purposefully directed its activities at California or purposefully availed itself of the privilege of conducting activities in California; (2) whether Plaintiff's claims arise out of Dolphin's forum-related activities; and (3) whether the exercise of jurisdiction is reasonable. *See Schwarzenegger*, 374 F.3d at 802.

#### a. Purposeful Direction

Where a defendant "has alleged copyright infringement, a tort-like cause of action, purposeful direction 'is the proper analytical framework.'" *Mavrix Photo v. Brand Techs.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (quoting *Schwarzenegger*, 374 F.3d at 802). Purposeful direction is analyzed pursuant to the "effects" test outlined in *Calder v. Jones*, 465 U.S. 763 (1984), which "requires that 'the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, and (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *See Mavrix Photo*, 647 U.S. at 1228 (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010)).

Here, the parties do not appear to dispute that the posting of infringing photos on imgchili.com is an intentional act. Indeed, the Ninth Circuit has made clear that "[t]here is no question that [a defendant] act[]s intentionally reposting [] allegedly infringing photos." *See Mavrix Photo*, 647 F.3d at 1229. Thus, the relevant inquiry is whether Dolphin expressly aimed its acts of infringement at California, and whether the infringement caused harm that Dolphin knew was likely to be suffered in California.

#### 1. Express Aiming

In order to establish that Dolphin expressly aimed its infringing acts at California, Plaintiff must show not only that Dolphin maintained an website that was accessible in

California, but also "something more" indicating that it purposefully targeted its actions at California. *See Mavrix Photo*, 647 F.3d at 1229. In *Mavrix Photo*, the Ninth Circuit explained that:

> In determining whether a nonresident defendant has done "something more," we have considered several factors, including the interactivity of the defendant's website, the geographic scope of the defendant's commercial ambitions, and whether the defendant individually targeted a plaintiff known to be a forum resident.

*Id.* Utilizing these factors, the Ninth Circuit held that the defendant had expressly aimed its copyright infringement at California because it displayed copyrighted photos on its website "as part of its exploitation of the California market for its own commercial gain." *Id.* The Ninth Circuit explained that a "substantial number of hits to [defendant's] website came from California residents"; the website utilized advertisements targeting California residents, thereby indicating that the defendant knew about its California user base; and it was clear from the record that the defendant "operated a very popular website with a specific focus on the California-centered celebrity and entertainment industries." *Id.* at 1230. It was emphasized that the defendant "anticipated, desired, and achieved a substantial California viewer base. This audience is an integral component of [defendant's] business model and its profitability." *Id.*

Here, Plaintiff asserts that Dolphin expressly aimed its infringement of Plaintiff's photos at California because it maintains an interactive website that enables uploads of copyrighted content by California users, utilizes servers owned by California companies, and "direct[s] injuries into the California forum," "including [injuries to] California copyright owners." *See* MTD at 6:10-20.

With respect to the factors delineated by the Ninth Circuit in *Mavrix Photo*, while imgchili.net is certainly interactive, because Dolphin profits from it and users must register in order to fully access the features, this alone is not sufficient to establish specific jurisdiction. Nor is Plaintiff's assertion that California residents can access imgchili.net – a fact the parties dispute, but a fact the Court presumes is true for purposes of this Motion – sufficient. *See DFSB Kollective Co. Ltd. v. Bourne*, 897 F.Supp.2d 871, 881 (N.D. Cal. 2012) ("'If the defendant merely operates a website, even a highly interactive website, that is accessible from, but does not target, the forum state, then the defendant may not be [subject to specific jurisdiction].'" (quoting *be2 LLC v. Ivanov*, 642 F.3d 555, 559 (7th Cir. 2011)).

With respect to the remaining two factors, Plaintiff has not made any showing regarding the "geographic scope of [Dolphin's] commercial ambitions." Unlike in *Mavrix Photo*, there is no evidence how many users of imgchili.net are California residents, nor is there any indication that imgchili.net has a specific focus on California. Indeed, Plaintiff has not identified "anything on [imgchili.net] that is directed to California or even references California." *See DFSB Kollective Co. Ltd.*, 897 F.Supp.3d at 811. Plaintiff's only evidence that imgchili.net has any connection to California at all is a website that Plaintiff itself maintains, which Plaintiff claims is located on a server in California and from which Plaintiff allegedly uploaded its own images to imgchili.net. *See* Opp'n at 3:3:10; Decl. of Eric Penn ¶¶ 14-23, Docket No. 106. However, courts have made clear that attempts by a plaintiff to manufacture a sufficient contact with the forum state are not sufficient to establish specific jurisdiction.[1] *See Millennium Enters., Inc. v. Millennium Music, LP*, 33 F.Supp.2d 907, 911 (D. Or. 1999) (holding that "[d]efendants cannot be said to have 'purposefully' availed themselves of the protections of this forum when it was an act of someone associated with plaintiff, rather than defendants," that caused the contact); *see also Burger King Corp.*, 471 U.S. at 476; *NuboNau, Inc. v. NB Labs, Ltd.*, No. 10cv2631-LAB (BGS), 2012 WL 843503, at *6 (S.D. Cal. Mar. 9, 2012) (holding that "orchestrated purchases" by a plaintiff cannot give rise to specific jurisdiction); *Edberg v. Neogen Corp.*, 17 F.Supp.2d 104, 112 (D. Conn. 1998) ("Only those contacts with the forum that were created by the defendant, rather than those manufactured by the unilateral acts of the plaintiff, should be considered for due process purposes.").

Nor has Plaintiff made any showing that Dolphin has "individually targeted a plaintiff known to be a forum resident." There is no dispute that Plaintiff is a Maryland corporation headquartered in Woodstock, Maryland, and is therefore not a resident of California. *See* SAC ¶ 9. Plaintiff attempts to assert that imgchili.net enables uploads of content stolen from California copyright owners, such as Playboy. *See* Opp'n at 3:19-23. However, Playboy is not a plaintiff in this action, and thus is not relevant to the analysis. *See Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919 ("In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from . . . the very controversy that

---

[1] In any event, the Court does not believe that asserting that Dolphin has *one* user in California is sufficient to show that it directly targets its infringing activity at California. *Cf. Mavrix Photo*, 647 F.3d at 1240 (finding specific jurisdiction where a "*substantial* number of hits to [defendant's] website came from California residents" (emphasis added)).

establishes jurisdiction." (internal quotations and citations omitted)); *NuboNau, Inc. v. NB Labs, Ltd.*, 2012 WL 843503, at *6 (S.D. Cal. Mar. 9, 2012) (rejecting claim that sales by California vendors unrelated to defendant could establish specific jurisdiction in California for plaintiff's trademark infringement claim against defendant).

Finally, Plaintiff attempts to assert that because Dolphin maintains accounts with California-headquartered companies, including CloudFlare and Paypal, it expressly aims its copyright infringement at California. *See* Opp'n at 6:10-15. However, courts in the Ninth Circuit have expressly rejected this theory. *See DFSB Kollective Co. Ltd.*, 897 F.Supp.2d at 883 ("Plaintiffs contend that the 'something more' is that [d]efendant utilized accounts on California-headquartered Internet companies . . . . the Court is unpersuaded that the headquarters of those Internet companies establishes that [d]efendant expressly aimed his infringing activities at the California market."); *NuboNau, Inc. v. NB Labs, Ltd.*, 2012 WL 843503, at *6 ("[T]he [c]ourt doesn't find that merely engaging Twitter and Facebook to promote one's business constitutes purposeful direction at California, simply because Twitter and Facebook happen to be based there . . . .").

In sum, Plaintiff has failed to establish that Dolphin expressly aimed its infringement of Plaintiff's works at California.

## 2.  **Foreseeable Harm**

In addition, Plaintiff has failed to make a sufficient showing that Dolphin's acts of infringement caused harm that Dolphin knew was likely to be felt in California. *See Brayton Purcell LLP*, 606 F.3d at 1131 ("This element is satisfied when defendant's intentional act has 'foreseeable effects' in the forum." (quoting *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)).  Courts in this district have held that harm caused by copyright infringement was foreseeable where a plaintiff is located in the forum and the defendant knows, or should have known, of the plaintiff's location; or where the infringement causes foreseeable economic harm in the forum. *See, e.g.*, *Brackett v. Hilton Hotels Corp.*, 619 F.Supp.2d 810, 818 (N.D. Cal. 2008) (emphasizing that "[t]he goal of the effects test is to establish jurisdiction where the effects of a defendant's contacts are felt in the forum"); *Brayton Purcell LLP*, 606 F.3d at 1131 ("It was foreseeable that [plaintiff] would be harmed by infringement of its copyright . . . in the [f]orum where [plaintiff] was known to reside."); *Mavrix Photo, Inc.*, 647 F.3d at 1232 (holding that it was foreseeable that significant economic loss would be inflicted in California

because "[a] substantial part of the [infringed] photos' value was based on the fact that a significant number of Californians would have bought publications . . . in order to see the photos. Because [defendant's] actions destroyed this California-based value, a jurisdictionally significant amount of [plaintiff's] economic harm took place in California.").

Here, Plaintiff is not located in California. Nor has Plaintiff made any showing that it suffered jurisdictionally significant harm in California as a result of Dolphin's infringement, or that such harm was foreseeable by Dolphin. As a result, Plaintiff has failed to establish a prima facie case under this prong as well.[2]

### b. Rule 4(k)(2)

Plaintiff has not attempted to establish personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2), pursuant to which a foreign defendant can be subject to personal jurisdiction based on its contacts with the United States as a whole. Under Rule 4(k)(2),"foreign defendants who are not otherwise subject to jurisdiction in any state but who have contacts with the nation as a whole ('national contacts') are subject to personal jurisdiction on claims arising under federal law." Schwarzer, Tashima, et al., Cal. Prac. Guide Fed. Civ. Proc. Before Trial (2016) § 3:33:5, at 3-15 (citing Fed. R. Civ. Proc. 4(k)(2); *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006); *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461 (9th Cir. 2007); *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico*, 563 F.3d 1285, 1297-98 (Fed. Cir. 2009)). To "establish personal jurisdiction based on a defendant's aggregated national contacts, plaintiff must prove three factors: the defendant is not subject to the personal jurisdiction of any state court of general jurisdiction; the claim arises under federal law; and the federal court's exercise of personal jurisdiction comports with due process." *Id.* § 3:35:5b, at 3-16 (internal quotation marks and citations omitted). "The due process analysis under Rule 4(k)(2) is nearly identical to the traditional personal jurisdiction analysis with one significant difference: rather than considering contacts between the defendants and the forums state, we consider contacts with the nation as a whole." *Id.* (internal quotations and citations omitted).

Here, the Court would consider allowing Plaintiff to submit supplemental briefing

---

[2] Because Plaintiff has failed to satisfy the "purposeful direction" prong of specific jurisdiction, the Court need not address whether Plaintiff's claims arise out of Dolphin's activity in California. In any event, the Court notes that Plaintiff has failed to make any showing that Plaintiff "would not have been injured *but for* defendant's conduct directed toward [Plaintiff] in the forum state." *See Brackett*, 619 F.Supp.2d at 818; *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.32 1007, 1021 (9th Cir. 2002) (finding claims arose out of defendant's forum-related activities where plaintiff's principal place of business was in forum state and defendant specifically competed with plaintiff in forum state by targeting residents of forum with marketing ads).

regarding whether Dolphin has sufficient contacts with the United States as a whole to warrant the exercise of specific jurisdiction. In doing so, Plaintiff would need to make a prima facie showing that Dolphin purposefully directed its infringing activities at the United States and that its claims arise out of or relate to Dolphin's forum-related activities. *See id.* (finding specific jurisdiction in the United States warranted under Rule 4(k)(2) based on defendant's intentional copying and distributing of infringing games to thousands of U.S. customers, resulting in its exploitation of the United States market for commercial game and harm to the United States copyright holder); *cf. NuboNau, Inc. v. NB Labs, Ltd.*, 2012 WL 843503, at *11-12 (finding no specific jurisdiction under Rule (4)(k)(2) where there was no indication that the foreign defendant intentionally aimed infringing acts at the United States).

## III. Motion to Dismiss for Improper Venue

### A. Legal Standard

Federal Rule of Civil Procedure 12(b)(3) permits a defendant to challenge the plaintiff's chosen venue. Fed. R. Civ. Proc. 12(b)(3). On such a challenge, the pleadings need not be accepted as true and the court may therefore consider supporting materials in the record, but the court must draw all reasonable inferences in favor of the non-moving party. *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2004). If the court decides that the case has been brought in the wrong division or district, the court "shall dismiss . . . [or] transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406.

### B. Analysis

Dolphin asserts that venue is improper because Plaintiff does not allege any meaningful connection between Dolphin and California, or even Plaintiff and California, and that the Central District of California has no connection to the events or omissions giving rise to the claims in this action. *See* MTD at 12:13-26.

In copyright infringement actions, venue is proper "in the district in which the defendant or his agent resides or may be found." *See* 28 U.S.C. § 1400(a). "The Ninth Circuit interprets this statutory provision to allow venue in any judicial district in which the defendant would be amenable to personal jurisdiction if the district were a separate state." *See Brayton Purcell LLP*, 606 F.3d at 1128 (internal quotation marks and citations omitted); *Autodesk, Inc. v. Kobayashi + Zedda Architects Ltd.*, 191 F.Supp.3d 1007, 1020 (N.D. Cal. 2016). "The Court uses basically the same procedure to decide a motion to dismiss for improper venue as it does for deciding a

motion to dismiss for lack of personal jurisdiction." *Goldberg v. Cameron*, 482 F.Supp.2d 1136, 1143 (N.D. Cal. 2007) (internal quotation marks and citations omitted). "Where . . . the motion to dismiss is based on written materials rather than an evidentiary hearing, [plaintiff] need only make a prima facie showing to demonstrate that the [forum] has personal jurisdiction over [defendants]." *Id.*

Plaintiff's only response to Dolphin's assertion of improper venue is that "[s]ince Dolphin is amendable to personal jurisdiction in this district, venue is proper." *See* Opp'n at 7:4-5. However, as discussed *supra*, Plaintiff has failed to make a prima facie showing of either general or specific jurisdiction. As such, the Court would find that venue is not proper in the Central District of California.[3] *Cf. Autodesk, Inc.*, 191 F.Supp.3d at 1021 (finding venue proper in Northern District of California where defendant was subject to personal jurisdiction in California and the basis of personal jurisdiction was the effects of the defendant's actions on a plaintiff located in the Northern District); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 243 F.Supp.2d 1073, 1095 (C.D. Cal. 2003) ("Because the Court concludes that jurisdiction is proper in this district, venue is proper as well.").

### C. Conclusion

In sum, the Court would GRANT Dolphin's Motion to Dismiss under Rule 12(b)(3).[4]

## IV. Conclusion

For the foregoing reasons, the Court would GRANT Dolphin's Motion to Dismiss with leave to amend as noted above.

---

[3] Should Plaintiff succeed in establishing nationwide jurisdiction under Rule 4(k)(2), the Court would require additional briefing regarding whether venue in the Central District of California is improper.

[4] Because the Court would find that Plaintiff has, at this point, failed to make out a prima facie case for personal jurisdiction and thus failed to establish that venue is proper, the Court would not address Dolphin's alternative contention that the case should be dismissed on the grounds of forum non conveniens.

# Exhibit
# 2

2012 WL 843503
Only the Westlaw citation is currently available.
United States District Court,
S.D. California.

NUBONAU, INC., etc., Plaintiff,
v.
NB LABS, LTD, etc., et al., Defendants.

No. 10cv2631–LAB (BGS).
|
March 9, 2012.

**Attorneys and Law Firms**

Anne F. Bradley, Debra D. Nye, Mary R. Conklin, Miriam Beezy, Foley & Lardner, LLP, Los Angeles, CA, for Plaintiff.

Camilo Echavarria, Anna R. Buono, Davis Wright Tremaine LLP, Michael Allen Painter, Isaacman Kaufman and Painter, Los Angeles, CA, Charles J. Meyer, Woodard, Emhardt, Moriarty, McNett & Henry, LLP, Indianapolis, IN, for Defendant.

**ORDER ON DEFENDANTS'
MOTIONS TO DISMISS**

LARRY ALAN BURNS, District Judge.

**\*1** Still pending in this case are the Defendants' motions to dismiss for lack of personal jurisdiction. Last October, after the motions had been filed but before NuboNau had opposed them, the Court allowed NuboNau to take limited discovery relating to the Defendants' jurisdictional arguments. Specifically, the Court ordered Dotcom Retail to "respond to NuboNau's thirteen document requests and eight interrogatories to the extent they request information regarding contacts with California. (Dkt. No. 24 at 9 .) It also ordered Cult Beauty to respond to NuboNau's document requests and interrogatories "with all responses limited to Cult Beauty's contacts in California." (Dkt. No. 24 at 9.) Finally, it ordered NB Labs to produce documents and answer interrogatories regarding its contacts both in California and the United States as a whole.¹ After NuboNau had taken the discovery allowed by the Court it filed an opposition to the motions to dismiss, to which Defendants each filed a reply.

As with its request for jurisdictional discovery, NuboNau lumps the Defendants together, at least in the "Legal Argument" portion of its opposition brief. The Court will address their motions to dismiss independently. First, however, it will reiterate the relevant jurisdictional standards.

**I. Jurisdictional Standards**
When NuboNau first requested jurisdictional discovery, it suggested that the Defendants' California contacts were adequate to establish the Court's personal jurisdiction over them, but that in the alternative the Defendants' *national* contacts were adequate to establish jurisdiction under the federal long-arm statute, Fed.R.Civ.P. 4(k)(2). It did not distinguish between the Defendants:

> Finally, NuboNau should be granted discovery not only to California contacts, but to all national contacts. Although NuboNau firmly believes that it can establish personal jurisdiction in California, should the Court find otherwise, NuboNau could still maintain its federal claims based on Defendants' national contacts across the United States collectively. *See* Fed.R.Civ.P. 4(k) (2). Where foreign defendants may otherwise have insufficient contacts with any one state, the foreign defendants' contacts with the United States as a whole may be aggregated to establish personal jurisdiction on claims arising under federal law.

(Dkt. No. 18–1 at 6.) The Court's allowance of jurisdictional discovery forced NuboNau to change that approach, at least as to Defendants Dotcom Retail and Cult Beauty. Now, because the Court limited NuboNau's discovery from these Defendants to information regarding their contacts *in California*, NuboNau cannot argue that the Court has jurisdiction over them under Rule 4(k)(2). Instead, it argues strictly that jurisdiction over them exists "in connection with the retail activities of [their] e-commerce business that clearly targets California customers." (Opp'n Br. at 11, 14.) With respect to NB Labs, NuboNau appears to rely only on Rule 4(k) (2). It

argues that "specific jurisdiction over NB Labs is proper for claims directly related to its use of the Nubo mark within the United States in a manner that is likely to cause confusion." (Opp'n Br. at 9.)

**\*2** The "Legal Argument" portion of NuboNau's brief confuses things, however, because there NuboNau appears to argue that jurisdiction exists over *all* Defendants, not just NB Labs, under Rule 4(k)(2) (even though its analysis is weighted heavily toward the Court's jurisdiction over NB Labs). Indeed, the major subheading in this section is titled "Under Fed.R.Civ.P. 4(k) (2) This Court May Consider Each Defendant's Contacts With The Entire United States." (Opp'n Br. at 15.) Anyway, the Court is assuming that NuboNau believes specific jurisdiction exists over Dotcom Retail and Cult Beauty because of their *California* contacts, while it exists over NB Labs under Rule 4(k)(2) because of its *national* contacts.

### A. Specific Jurisdiction

Three conditions must be satisfied to trigger the Court's specific jurisdiction over a non-resident defendant.

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of personal jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L' Antisemitisme,* 433 F.3d 1199, 1205–06 (9th Cir.2006).

"Purposeful direction," the first condition [2], occurs where the defendant (1) commits an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Id.* at 1206 (citing *Schwarzenegger,* 374 F.3d at 802. This test, which is traceable to the Supreme Court's decision in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), is an effects test that focuses on where a defendant's acts were *felt,* rather than where they

actually occurred. *Yahoo! Inc.,* 433 F.3d at 1206. The "harm" required need not be the *brunt* of the harm of the defendant's acts. To the contrary, "[i]f a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state." *Id.* at 1207.

The second condition—the claim must arise out of the defendant's forum-related activities—simply means that the defendant's alleged activities must be the "but for" cause of the claim. *Bancroft & Masters, Inc. v. Augusta Nat. Inc.,* 223 F.3d 1082, 1088 (9th Cir.2000).

Comportment with fair play and substantial justice, the third condition, requires the Court to consider several factors, including: (1) the extent of the defendant's purposeful interjection into the forum state; (2) the burden on the defendant of defending in the forum; (3) the extent of the conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *Id.* at 1088. Each factor must be considered, and none is dispositive. *Ziegler v. Indian River County,* 64 F.3d 470, 475 (9th Cir.1995).

### B. 4(k)(2) Jurisdiction

**\*3** Rule 4(k) (2) "permits federal courts to exercise personal jurisdiction over a defendant that lacks contacts with any single state if the complaint alleges federal claims and the defendant maintains sufficient contacts with the United States as a whole." *Getz v. Boeing Co.,* 654 F.3d 852, 858 (9th Cir.2011). For jurisdiction to arise under the Rule, the claim must arise under federal law, the defendant must not be subject to the personal jurisdiction of any state court of general jurisdiction, and the federal court's exercise of personal jurisdiction must comport with due process. *Holland America Line Inc. v. Wartsila North America, Inc.,* 485 F.3d 450, 461 (9th Cir.2007). The due process analysis under Rule 4(k)(2) is nearly identical to the traditional personal jurisdiction analysis, the only difference being that the focus shifts from contacts with the forum state to contacts with the nation as a whole. *Id.* at 463 (citing *Pebble Beach Co. v. Caddy,* 453 F.3d 1151, 1159 (9th Cir.2006)).

### II. Dotcom Retail

NuboNau, Inc. v. NB Labs, Ltd, Not Reported in F.Supp.2d (2012)
Case 2:16-cv-01494-DGC Document 57 Filed 05/23/17 Page 26 of 35
2012 WL 843503

NuboNau alleges that "Dotcom Retail offers NUBO products for sale through its website www.BeautyBay.com ... which [is] accessed by consumers worldwide." (Compl.¶ 22.) In opposing jurisdictional discovery Dotcom Retail argued that its only sales to California were orchestrated by NuboNau's investigator, but one of Dotcom Retail's argument for dismissal is that it isn't legally responsible for the BeautyBay website in the first place. [3] Rather, it owns the website's domain name (and trademark), and just licenses it to a separate subsidiary company, BeautyBay.com Limited. As Dotcom Retail sees it, then, "Plaintiff has mistakenly identified an uninvolved company in its complaint." (Dkt. No. 8–1 at 1.) The Court will bypass this alter ego issue because *even if* BeautyBay.com's contacts with California could be attributed to Dotcom Retail the Court does not find them sufficient to support personal jurisdiction here.

NuboNau's first charge against Dotcom Retail to establish specific jurisdiction—and, specifically, to satisfy the "purposeful direction" condition—is that "Dotcom admits that BeautyBay.com has sold NUBO products to customers in California ...." (Opp'n Br. at 12.) That's rather misleading. What Dotcom Retail admits is that it received two orders from California, both of which "were apparently placed by agents of the Plaintiff." (Opp'n Br., Ex. 18 at 4.) One was placed by an investigator with National Trademark Investigations, and another was placed by NuboNau co-owner Hazel Walker. The Court already ruled in its order on jurisdictional discovery that "this kind of orchestrated purchase cannot give rise to personal jurisdiction over Dotcom Retail in California." (Dkt. No. 24 at 7.) *See Sinatra v. National Enquirer, Inc.,* 854 F.2d 1191, 1195 (9th Cir.1988) ("In order to have purposefully availed oneself of conducting activities in the forum, the defendant must have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state."); *Edberg v. Neogen Corp.,* 17 F.Supp.2d 104, 112 (D.Conn.1998) ("Only those contacts with the forum that were created by the defendant, rather than those manufactured by the unilateral acts of the plaintiff, should be considered for due process purposes.").

**\*4** "In the internet context, the Ninth Circuit utilizes a sliding scale analysis under which 'passive' websites do not create sufficient contacts to establish purposeful availment, whereas interactive websites may create sufficient contacts, depending on how interactive the website is." *Jeske v. Fenmore,* 2008 WL 5101808 at *4 (C.D.Cal. Dec.1, 2008) (citing *Boschetto v. Hansing,* 539 F.3d 1011, 1018 (9th Cir.2008)). "[T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the internet." *Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414, 419 (9th Cir.1997) (quotation omitted). Here, Dotcom Retail's website isn't inherently passive—it is, after all, a website that consumers visit to buy products—but through the website Dotcom Retail has conducted virtually *no* commercial activity involving the NUBO products at issue. Under the Ninth Circuit's sliding scale, the Court finds no basis for jurisdiction when the only relevant commercial activity was both minimal and instigated by NuboNau. *See Life Alert Emergency Response, Inc. v. Lifealert Sec., Inc.,* 2008 WL 5412431 at *4 (C.D.Cal. Dec.29, 2008) ("The mere maintenance of an interactive website, without consummated commercial activity, is not sufficient to establish specific jurisdiction over Defendant.").

NuboNau next cites a number of Dotcom Retail's activities in California that have *nothing* to do with the advertising or sale of NUBO-branded products. For example, between April 2009 and the commencement of this lawsuit, BeautyBay.com sold approximately 400 *non*-NUBO products worth approximately $40,000 to California residents. (Opp'n Br., Ex. 7 at BB 6–13; Ex. 18 at 4.) BeautyBay.com also sells the products of California-based companies other than NB Labs. (Opp'n Br., Ex. 18 at 4; Ex. 7 at BB 17–24.) And for approximately one month in the summer of 2009, an officer of BeautyBay.com visited California to explore the possibility of creating a U.S. subsidiary, and as part of that effort he rented an apartment and met with attorneys, marketing agencies, and an insurance agent. (Opp'n Br., Ex. 18 at 5.) The second condition for specific personal jurisdiction to exist bears repeating here. NuboNau's claims against Dotcom Retail "must be one[s] which arise[ ] out of or relate[ ] to the defendant's forum-related activities." *Yahoo! Inc.,* 433 F.3d at 1205. [4] NuboNau's claims, however, are trademark-based claims that revolve around the advertising and sale of NUBO products in California. (*See* Compl. ¶¶ 22, 28, 33, 38, 43, 50, 56.) The fact that Dotcom Retail has sold *other* products to customers in California, or has entered into commercial agreements with *other* California-based vendors, or generally explored the possibility of

establishing a California presence, is a completely separate matter. To put the point another way, the core claim of this trademark case is that consumers are likely to confuse the NUBO products sold by Dotcom Retail for NuboNau products. In no way can that be considered a consequence of Dotcom Retail selling non-NUBO products to California residents, or a Dotcom Retail official visiting California and meeting with lawyers and an insurance agent to explore business opportunities. *See Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.,* 243 F.Supp.2d 1073, 1085 (C.D.Cal.2003) ("Contacts with U .S. agents such as public relations representatives and lawyers ... and the use of a California company ... are simply not but for causes of the alleged infringement."); *Fujitsu–ICL Systems, Inc. v. Efmark Service Co. of Illinois, Inc.,* 2000 WL 1409760 at *5 (S.D.Cal. June 29, 2000) ("Here, Defendant's two meetings in California were not related to the negotiation or performance of the disputed contracts."). Specific jurisdiction is "tethered to a relationship between the forum and *the claim,"* not simply the forum and the defendant. *Holland America,* 485 F.3d at 460 (emphasis added).

**\*5** NuboNau also seizes on Dotcom Retails's internet advertising through Google to show California contacts that give rise to personal jurisdiction. Specifically, Dotcom Retail admits that it pays Google for search engine results that send internet shoppers its way, that it has designated most of the world as its target market, and that "[t]raffic attributable to persons in California under Google's program and which is presumably in response to information which Google displayed to persons in California, accounts for approximately 0.11% of BeautyBay.com's total traffic attributable to Google's advertising program." (Opp'n Br., Ex. 18 at 10.) As the Court reads the internet traffic data submitted by NuboNau, BeautyBay.com has been visited 3,928,717 times *total,* and 34,296 times by California residents. Of those 34,296 visits, 4,240 were click-thru visits for which Google was paid. [5] (Opp'n Br., Ex. 7 at BB 25–27.)

To be clear, "no court has ever held that an Internet advertisement alone is sufficient to subject the advertiser to jurisdiction in the plaintiff's home state." *Cybersell,* 130 F.3d at 414. Rather, there must be something more "to indicate that the defendant purposefully (albeit electronically) directed his activity in a substantial way to the forum state." *Id.* That "something more" may be the individualized targeting of, or express aiming at, a forum residents. [6] *Pebble Beach Co. v. Caddy,* 453 F.3d 1151, 1156 (9th Cir.2006). For example, in *Panavision Int'l v. Toeppen,* 141 F.3d 1316 (9th Cir.1998), the Ninth Circuit found that an Illinois-based cybersquatter who registered a California company's trademark as part of a domain name could be sued in the Central District of California because the cybersquatter actually demanded money from the plaintiff in order to release the domain name. The Court does not believe that the minimal fraction of Dotcom Retail's *worldwide* Google-based advertising that appeared on computer screens in California is sufficient to establish that Dotcom Retail "purposefully directed" its actions to California. The Google ads are akin, in the Court's judgment, to ads in national publications that simply happen to make their way into California, and courts have consistently held this not to constitute "purposeful direction." *See Neuromechanical, LLC v. Kiro Kids Pty. Ltd.,* 2011 WL 333337 at *3 (D.Ariz. Jan.31, 2011) (collecting cases). [7] Just because a foreign act has foreseeable effects in a forum state does not mean specific jurisdiction there is appropriate. *Bancroft,* 223 F.3d at 1087.

This isn't to say that internet advertising can't ever constitute "purposeful direction" for jurisdictional purposes. It can, but there must be more than the click-thru Google advertisements seized on by NuboNau here. For example, in *Park Inns Int'l v. Pacific Plaza Hotels, Inc.,* an Arizona district court exercised jurisdiction over an Oakland hotel in a trademark infringement action because of its online advertisements, but those advertisements: (1) included the allegedly infringing trademark; and (2) actually resulted in the transaction of business. 5 F.Supp.2d 762 (D.Ariz.1998). Neither of these things can be said of BeautyBay.com advertisements prompted by Google searches in California. Another way to put this point, of course, is to make it less about "purposeful direction" and more about whether NuboNau's claims actually arise out of Dotcom Retail's contacts in California. Considering that Dotcom Retail made only two sales of NUBO products in California (both orchestrated by NuboNau), and that the Google ads, presumably, merely directed internet browsers to BeautyBay.com's website and not to particular NUBO product pages, it's hard to argue that the alleged infringement *arises out of* the Google ads. *See also Advice Company v. Novak,* 2009 WL 210503 (N.D.Cal. Jan.23, 2009) (no specific jurisdiction in a trademark case filed against an Arizona company in California *even where*

2012 WL 843503

Internet banner and link ads and nationwide mailings reached California and advertisements were placed in a California magazine).

**\*6** Finally, NuboNau calls to the Court's attention the fact that Dotcom Retail "also uses a Twitter account and a Facebook account to promote its business," and that it has agreed to litigate all lawsuits arising out of these accounts in California. (Opp'n Br. at 13.) First, in case NuboNau means to suggest that merely having a commercial relationship with a California company subjects Dotcom Retail to this Court's jurisdiction, it is mistaken. The Supreme Court addressed that argument squarely in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985): "If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot." *Id.* at 478. Where the commercial relationship isn't even with the plaintiff, the Supreme Court's holding in *Burger King* would seem to be even stronger. As for the choice-of-law provision in Dotcom Retail's user agreements with Twitter and Facebook, *Burger King* also recognized that this, on its own, cannot confer jurisdiction in the state whose law is specified. *Id.* at 482. *See also Fujitsu,* 2000 WL 1409760 at \*5 (noting that "the mere fact that a state's law can be properly applied to a dispute does not necessarily confer personal jurisdiction over the parties in the state's courts"). With *Burger King* in mind, the Court doesn't find that merely engaging Twitter and Facebook to promote one's business constitutes purposeful direction at California, simply because Twitter and Facebook happen to be based there and require users to litigate all lawsuits arising out of their accounts in California. [8] To the extent NuboNau disagrees, the Court would simply proceed to the second condition of the specific jurisdiction analysis and find that NuboNau alleges nothing in particular about Dotcom Retail's activities on Twitter and Facebook to support a finding that its alleged trademark infringement arises out of those activities. To the contrary, NuboNau simply argues, generally, that Dotcom Retail uses the social media platforms to "promote its business." (Opp'n Br. at 13.)

For the above reasons, the Court finds no basis for exercising specific jurisdiction over Dotcom Retail. NuboNau has not shown the kind of "purposeful direction" on Dotcom Retail's part that is the first

condition of such jurisdiction, nor has it even argued that its actual trademark-based claims arise out of acts that it believes constitute "purposeful direction." NuboNau points to no authority that supports jurisdiction on the particular facts it alleges, and the authority consulted by the Court counsels the opposite result. *See, e.g., Schwarzenegger,* 374 F.3d at 802–07; *Cybersell,* 130 F.3d at 419–20; *Advice Co.,* 2009 WL 210503 at \*16; *Fujitsu,* 2000 WL 1409760 at \*6–7. [9] Dotcom Retail's motion to dismiss for lack of personal jurisdiction is therefore **GRANTED.**

## III. Cult Beauty

**\*7** The above analysis of the Court's specific jurisdiction over Dotcom Retail should make it clear where the analysis with respect to Cult Beauty is headed. NuboNau alleges the following California contacts. First, Cult Beauty twice sold NUBO products in California, both times to an investigator with National Trademark Investigations. (Dkt. No. 12–1 at 3.) Second, Cult Beauty stocks and sells products from three California-based companies: (1) Neil George Hair Care, a Beverly Hills Salon; (2) Jouer, a Los Angeles cosmetics company; and (3) Fix Malibu, a Malibu skincare company. (Opp'n Br, Ex. 10 at 5; Ex. 8 at CB 13–29.)). Third, Cult Beauty has made 74 sales of non-NUBO products to California residents, totaling approximately $10,000. (Opp'n Br., Ex. 10 at 6; Ex. 8 at CB 1–3.) Fourth, Cult Beauty has an email subscriber list, to which 155 California residents subscribe. (Opp'n Br., Ex. 10 at 6.) And fifth, like Dotcom Retail, Cult Beauty has a Twitter and Facebook account. (Opp'n Br, Ex. 12 at 8.) For the same reasons given above with respect to Dotcom Retail, the Court finds a lack of purposeful direction on Cult Beauty's part. Moreover, none of the contacts seized upon by NuboNau are the "but for" cause of Cult Beauty's alleged trademark offenses, and so NuboNau's claims cannot be said to arise out of those contacts as is required for the Court to base its exercise of specific jurisdiction upon them. Cult Beauty's motion to dismiss for lack of personal jurisdiction is **GRANTED.**

## IV. NB Labs

NB Labs is the Defendant NuboNau is most eager to bring into this Court, and its contacts with the United States are certainly more substantial than those of Dotcom Retail and Cult Beauty, who simply sell NUBO products online. The Court will first lay out, in no particular order, NB

Labs' alleged contacts with the United States. Second, it will discuss an exchange between NB Labs and NuboNau in which NuboNau warned NB Labs of its trademark in the United States. Third, it will determine whether jurisdiction is appropriate under the federal long-arm statute, Fed.R.Civ.P. 4(k)(2).

### A. NB Labs' Contacts

*First,* NuboNau claims that "NB Labs admits that its resellers have sold Nubo brand products into California." (Opp'n Br. at 5.) The Court has addressed this above. The only sales of NUBO products in California were orchestrated by NuboNau's investigator from National Trademark Investigations. NB Labs provides firm evidence of this in its motion to dismiss. (*See* Dkt. No. 11–1 at 3–4.)

*Second,* NuboNau points out that five NUBO products are manufactured in Florida. NB Labs concedes this. The products are indeed manufactured by a third party company based in Florida with whom NB Labs has had a relationship since 2007, and they are shipped to the United Kingdom for packaging and resale. (Opp'n Br, Ex. 5 at 7–8.) NUBO products say "Made in USA" on their packaging. (Opp'n Br., Ex. 21.)

*Third,* NB Labs maintains two websites, www.nblabs.com and www .nubobeauty.com, and the latter has been visited just under 3,000 times from within the United States, with over 700 of those visits made by California residents. (Opp'n Br., Ex. 6 at NB Labs 279.)

 **\*8** *Fourth,* referencing documents produced by NB Labs that it cannot make complete sense of (nor can the Court), NuboNau claims that NB Labs engaged in some online advertising, and that its ads popped up on computers in the United States over 2 million times and were actually clicked on over a thousand times. (Opp'n Br., Ex. 6 at NB Labs 282.) NuboNau claims, in addition, that NB Labs' online ads were "targeted at the United States," but this appears as a mere conclusory allegation for which the Court doesn't see any direct evidence in the documents produced by NB Labs.

*Fifth,* NB Labs contacted a consulting firm in the United States to advise it on entering the United States market through high-end retail stores. This firm was The Krysalis Group, and it submitted a marketing proposal to NB Labs on February 17, 2010. (Opp'n Br., Ex. 6 at NB

Labs 60–64.) NB Labs never engaged The Krysalis Group, however, and explains that "no marketing or promotion was initiated." (Opp'n Br., Ex. 5 at 10.) In addition, an employee of NB Labs emailed a NUBO "brand presentation" to an employee of NuboNau on August 12, 2010 and acknowledged that NB Labs was in the process of engaging a public relations agency in the United States and launching its products at Henri Bendel and The Plaza Hotel in New York City. (Walker Decl., Ex. 1 at 5.)

*Sixth,* NuboNau argues that "emails produced by NB Labs show that between September 2010 and January 2011, an NB Labs employee named Rachel Wiener, using the email address rw@nblabs.com, was working in the United States to make contact with high-end skincare buyers from major U.S. retailers such as Neiman Marcus and Nordstrom on NB Labs' behalf." (Opp'n Br. at 7.) That's a little bit misleading. Emails produced by NB Labs show that Ms. Wiener had sparked the interest of United States buyers in NUBO, and on September 13, 2010 she provided their mailing addresses to NB Labs so that product samples could be sent to them. (Opp'n Br., Ex. 6 at NB Labs 43.) On September 28, having heard nothing, Ms. Wiener sent a follow-up email asking about the status of the samples. (Opp'n Br ., Ex. 6 at NB Labs 43.) On November 9, 2010, Marina Shcherbinina, the CEO of NB Labs, replied to Ms. Wiener that the samples hadn't been sent because of "a problem with TM registration." (Opp'n Br., Ex. 6 at NB Labs 46.) Almost two months later, on January 7, 2011, Ms. Shcherbinina told Ms. Wiener over email that NB Labs' lawyer had advised that no products be shipped to the United States, even for personal use. (Opp'n Br., Ex. 6 at NB Labs 48.) [10]

*Seventh,* in August and early September of 2009, Ms. Shcherbinina was in contact with a cosmetics buyer from Bergdorf Goodman in New York City, Patricia Saxby, about presenting the NUBO brand to Ms. Saxby and discussing an exclusive United States launch of NUBO at Bergdorf. They scheduled a meeting for September 15, 2009. (Opp'n Br., Ex. 6 at NB Labs 53–59.) Ms. Shcherbinina planned on being in the United States at this time for "HBA," which the Court presumes is some kind of beauty industry trade show. (Opp'n Br., Ex. 6 at NB Labs 56.) NB Labs sent sample NUBO products to Ms. Saxby on October 16, 2009. (Opp'n Br., Ex. 6 at NB Labs 175.) On this same trip, Ms. Shcherbinina met with The Plaza Hotel. (Opp'n Br., Ex. 5 at 10.)

**\*9** *Eighth,* in 2009 NB Labs shipped sample NUBO products to Vogue magazine, a spa called Bliss, and Fred Segal, a high-end retail store in California. As the Court reads the UPS records produced by NB Labs, Vogue's shipment went out on June 5, 2009 and the other two went out on June 22, 2010. [11] (Opp'n Br., Ex. 6 at NB Labs 168, 172, 173.) NB Labs concedes that it contacted Fred Segal about launching its products, but explains that it never received a response. (Opp'n Br., Ex. 5 at 5.)

*Ninth,* in July of 2010 NB Labs attended a beauty industry trade show in Las Vegas called Cosmoprof. (Opp'n Br., Ex. 5 at 8.) There, samples of NUBO products were distributed to approximately seven retail vendors, including The Plaza Hotel, Fred Segal, Henri Bendel, and Bliss. (Opp'n Br., Ex. 5 at 9.) After the trade show, NB Labs discussed the possibility of launching its products with Beauty Collection, another company with which it met in Las Vegas. (Opp'n Br., Ex. 5 at 5.)

*Tenth,* like Dotcom Retail and Cult Beauty, NB Labs has a Twitter account. (Opp'n Br., Ex. 6 at NB Labs 189–278.) According to NuboNau, NB Labs "has aggressively promoted its Nubo brand worldwide using its Twitter account, including within the United States." (Opp'n Br. at 8.)

**B. Notice of Trademark**
Sometime in late 2008, but perhaps early in 2009, NB Labs applied to register its NUBO trademark in the United States. (Dkt. No. 11–2, Shcherbinina Decl. ¶ 9.) The United States Trademark Office denied NB Labs' application because of NuboNau's preexisting trademark on July 29, 2010. [12] Aware of this, NuboNau's president Phillip Walker instructed an employee named Clemence Coussy in early August of 2010 to "contact NB Labs directly to ask for details regarding the NB Labs product including availability and supply to retailers in the United States." (Opp'n Br., Walker Decl. ¶ 6.) Paul Sillence, in charge of international sales for NB Labs, responded to Mr. Coussy's email on August 12, 2010. Mr. Sillence attached a NUBO brand presentation and acknowledged that NB Labs was in the process of engaging a United States-based public relations firm. He also told Mr. Coussy he had just returned from New York "where we are planning a launch at Henri Bendel in January and also the Plaza Hotel." (Opp'n Br., Walker Decl., Ex. 1.) Mr. Sillence noted that NB Labs had a "US warehouse in

Boston" and could "invoice in U.S. dollars." (Opp'n Br., Walker Decl., Ex. 1.) To be clear, this was on August 12, 2010.

On August 18, 2010, not even a week after Mr. Sillence responded to Mr. Coussy, Mr. Walker emailed Mr. Sillence, who apparently is an acquaintance. (Opp'n Br., Walker Decl., Ex. 4.) The purpose of Mr. Walker's email was to flag NuboNau's trademark in the United States and suggest that NUBO either avoid the market or else enter it with a different brand name:

> We have spent a considerable amount of time and money securing our trademarks and brand name in the US. We understand that Nubo has applied for a trademark in the US. On 29 July 2010 the U.S. Trademark authorities raised concerns about your proposed trademark on the grounds that the name Nubo is too similar to NuboNau, and would cause confusion to the consumer ...

**\*10** It is our view that the names are too similar and that given the investment we have made and the level of professional advice we have had to secure our trademarks, we would vigorously defend our trademarks. I am hoping that we might have raised the issue in enough time for both of us to avoid what would no doubt be at the least very expensive legal bills, and at worst significant financial damage for one of us ...

> No doubt you will need to decide what is best for your company. Hopefully the issue can be resolved with the minimum cost for all parties concerned, I just wanted to flag the issue to you as soon as possible.

(Opp'n Br., Walker Decl., Ex. 4.) Ms. Shcherbinina replied to Mr. Walker by email on September 14, 2010. NuboNau describes this email as "stating that she continues to plan to launch her product in the United States despite NuboNau's assertions of infringement." (Opp'n Br. at 4.) That paints an incomplete picture of Ms. Shcherbinina's lengthy and at points conciliatory email. Ms. Shcherbinina did indeed say that launching NUBO products in the United States "is still our plan," and that she considered NuboNau's legal case "not that strong." But she also expressed an interest in minimizing confusion between NuboNau and NUBO products, proposed to differentiate however possible to co-exist, and invited NuboNau to enter the European market where NUBO's trademark was well-established. (Opp'n Br., Walker Decl., Ex. 5.)

Ms. Shcherbinina also indicated that she hadn't heard of NuboNau until Mr. Walker's August 18, 2010 email.

On September 15, 2010, the day after Ms. Shcherbinina emailed Mr. Walker, he acknowledged receipt of her email and said he would be in touch in due course. (Opp'n Br., Walker Decl., Ex. 6.) As of September 27, 2010, however, he hadn't responded, and on that date Ms. Shcherbinina sent a follow-up email in which she noted that NUBO's European trademark preceded that of NuboNau, that "the EU trade mark office did not regard the two trade marks as confusingly similar," and that if NuboNau objected to NUBO's registration in the United States NB Labs would attempt to invalidate NuboNau's European trademark. (Opp'n Br., Walker Decl., Ex. 6.)

It is worth noting that all of NB Labs' attempts to enter the United States market, which are really the core of NuboNau's argument that specific jurisdiction exists under the federal long-arm statute, *preceded* Mr. Walker's August 18, 2010 email to Ms. Shcherbinina in which NB Labs learned of NuboNau's United States trademark for the first time: (1) reaching out to The Krysalis Group (February 17, 2010); (2) attempting to launch NUBO products with Henri Bendel (August 12, 2010); (3) contacting a cosmetics buyer with Bergdorf Goodman (September 15, 2009); (4) shipping samples of Nubo products to Vogue, Bliss, and Fred Segal (June of 2009 and June 22, 2010); and (5) attending the Cosmoprof trade show in Las Vegas (July of 2010).

NuboNau tries to argue that Ms. Wiener was soliciting NUBO buyers in the United States *after* August 18, 2010, but that's not exactly right. (*See* Opp'n Br. at 7, 9 ("These facts also show that as recently as January 5, 2011, long after NB Labs received notice of this claim and even after this lawsuit was filed, NB Labs was still employing a US-based sales person to promote the Nubo products.").) It is true that on September 13, 2010, *after* Ms. Shcherbinina had seen Mr. Walker's August 18, 2010 email and one day before she responded to it, Ms. Wiener checked in on the status of samples to be sent to promising accounts in the United States. (Opp'n Br., Ex. 6 at NB Labs 43.) However, in two emails to Ms. Wiener on the subject, first on November 9, 2010 and then on January 7, 2011, Ms. Shcherbinina was clear that a trademark issue had sprouted that was stalling the sale of NUBO products in the United States. (Opp'n Br., Ex. 6 at NB Labs 46, 48.) Indeed, after August 18, 2010 NB Labs repeatedly told

potential customers in the United States that its products were unavailable in the United States and could not be shipped there. (*See, e.g.,* Opp'n Br., Ex. 6 at NB Labs 71–97.) It also told its resellers not to sell to customers in the United States. (Opp'n Br., Ex. 6 at NB Labs 98–103.)

### C. Discussion

**\*11** To revisit the legal standard, the Court may exercise specific jurisdiction over NB Labs only if (1) it purposefully directed its activities toward the United States; (2) NuboNau's claims against it arise out of those activities; and (3) the exercise of personal jurisdiction is reasonable. *Yahoo! Inc.,* 433 F.3d at 1205–06. The focus is on contacts with the United States as a whole, rather than contacts strictly with California, because NuboNau asserts that jurisdiction arises under the federal long-arm statute, Fed.R.Civ.P. 4(k)(2). *Holland America,* 485 F.3d at 461.

It's clear to the Court, up front, that several contacts highlighted by NuboNau should not even enter into the analysis, for reasons the Court either gave in its previous order on jurisdictional discovery or in this Order with respect to its specific jurisdiction over Dotcom Retail and Cult Beauty. Those contacts are: (1) the orchestrated sales of NUBO's products from Dotcom Retail and Cult Beauty to NuboNau's investigator; (2) the fact that NUBO products are manufactured in Florida; (3) NB Labs' websites [13] and its online advertising; and (4) NB Labs' Twitter account. Either those contacts do not constitute purposeful direction at the United States (or purposeful availment of the privilege of conducting business in the United States), or it cannot plausibly be said that NuboNau's trademark-based claims arise out of those contacts. What distinguishes NB Labs' contacts from those of the dismissed retail Defendants, and what NuboNau makes really the biggest deal out of, are NB Labs' attempts to enter the United States market. Having narrowed the discussion to those contacts, the question before the Court is whether a company's *pre*-market contacts with a forum, as it were, can give rise to specific jurisdiction over the company in that forum.

### 1. Purposeful Direction

Purposeful direction, as noted above, requires that a defendant commit an intentional act, expressly aimed at the United States, that causes harm the defendant knows is likely to be suffered in the United States. The second

and third prongs of the requirement—express aiming and harm—are sometimes collapsed into one. *See, e.g.,* *Bancroft,* 223 F.3d at 1087 (deducing that the "express aiming" requirement "is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state"); *Wine Group LLC v. Levitation Management, LLC,* 2011 WL 4738335 at *6 (E.D.Cal. Oct.6, 2011) (noting that courts have considered whether the defendant individually targeted a plaintiff known to be a forum resident in evaluating whether online activity is expressly aimed at a forum).

The Court has no problem with NuboNau arguing that NB Labs' exploration of the United States market—reaching out to The Krysalis Group, communicating with a cosmetics buyer at Bergdorf Goodman, sending samples to Vogue, Bliss, and Fred Segal, attending Cosmoprof in Las Vegas, and working with Ms. Wiener to establish accounts in the United States—was comprised of intentional acts. That's uncontroversial. The far more troubling argument is that NB Labs caused harm *that it knew* NuboNau was likely to suffer in California. NuboNau claims "there are some contested facts regarding when NB Labs first became aware of the NuboNau mark," but the Court doesn't know what those are. To the contrary, it seems *un* contested that prior to August of 2010 NB Labs was feeling out the United States, and that after Mr. Walker emailed Mr. Sillence on August 18, 2010 NB Labs abandoned those efforts. Thus, all NuboNau can point to are NB Labs' exploratory efforts, which the Court finds are not the kind of "expressly aimed" intentional acts that can constitute purposeful direction. *See One True Vine v. Liquid Brands,* 2011 WL 2148933 at *5 (N.D.Cal. May 31, 2011) ("The Court is unaware of any authority—and Plaintiff has failed to cite any—for the proposition that sending samples of a product to a prospective distributor is sufficient to meet the express aiming requirement."). They are more like *attempted* purposeful direction.

 **\*12**  Even if the Court were to accept that NB Labs' attempts to enter the United States market constituted "purposeful direction," it would find that NuboNau's claims do not arise out of those attempts. Against this, NuboNau argues that "but for NB Labs' efforts to expand into the United States market ... there could be no confusion or harm to NuboNau's goodwill." (Opp'n Br. at 24.) The "confusion" only arises, however, when an allegedly infringing good actually makes its way to the market and stands a chance of perplexing customers as to its corporate or brand origin. Likewise, the distinctive quality of NuboNau's trademark can't be diluted or harmed by a good that doesn't make its way into the stream of commerce in the United States in the first place.

Each of NuboNau's claims against NB Labs, as the Court has already noted, presumes that NUBO products were actually sold or available for sale in the United States and in consumers' lines of sight. Its trademark infringement claim alleges that "NB Labs' use of 'NUBO' ... is likely to cause confusion among consumers as to the source of NB Labs' ... products." (Compl.¶ 33.) Its false designation claim alleges the same thing. (Compl.¶ 38.) Its trademark dilution claim alleges that "NB Labs' use of 'NUBO' in connection with its products ... is causing dilution of the distinctive quality of the NUBONAU Marks." (Compl.¶ 43.) Its second trademark dilution claim alleges that NB Labs' use of "NUBO" as a trademark "is causing NuboNau monetary damage and irreparable harm and resulting in Defendants' enrichment." (Compl.¶ 50.) Its unfair competition claim alleges the same thing. (Compl.¶ 56.) Its false advertising claim alleges that NB Labs claims its products are all natural and organic when in fact they are not. (Compl.¶ 63.) The point here is that none of these claims arise out of the *pre*-market contacts on which NuboNau tries to establish jurisdiction. NuboNau cannot seriously argue, for example, that NB Labs' conversations with The Krysalis Group, or its mere shipment of product samples to Vogue, or its conversations with a cosmetics buyer for Bergdorf Goodman, is likely to cause confusion *among consumers* as to the source of its products. [14] None of NB Labs' attempts to enter the United States market, in other words, are the but for cause of NuboNau's alleged injuries.

In light of the above, the Court finds no purposeful direction here on the part of NB Labs, and its motion to dismiss for lack of personal jurisdiction is therefore **GRANTED.**

## V. **Conclusion**

The Defendants' motions to dismiss are **GRANTED.** The Clerk shall close this case.

**IT IS SO ORDERED.**

2012 WL 843503

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 843503

Footnotes

1    NuboNau now claims that it "was not allowed to conduct jurisdictional discovery related to the Defendants' contacts with the United States generally" in order to establish jurisdiction under the federal long-arm statute, Fed.R.Civ.P. 4(k)(2). (Opp'n Br. at 3 n. 1.) With respect to NB Labs, that's wrong. With respect to Dotcom Retail and Cult Beauty, the Court would put the point differently. There must be a colorable showing that personal jurisdiction exists before jurisdictional discovery is warranted, and NuboNau failed to make that showing with respect to the *national* contacts of Dotcom Retail and Cult Beauty.

The fact is that the Court gave a reasoned explanation for allowing NuboNau to take discovery only on the *California* contacts of Dotcom Retail and Cult Beauty:

Without any evidence that Dotcom Retail has sold NUBO products outside of California in the United States, NuboNau has made no colorable showing that jurisdiction arises here pursuant to Rule 4(k)(2). It is therefore not entitled to discovery on Dotcom Retail's contacts in the broader United States. Dotcom Retail does concede that it made sales outside of California. (Dkt. No. 19 at 2; Dkt. No. 8–2.) But the number of such sales—three—is only marginally more significant than its California sales, and thus could not support a finding of national jurisdiction where there is no personal jurisdiction. *Holland America,* 485 F.3d at 461. Moreover, in correspondences with counsel for Dotcom Retail, counsel for NuboNau suggests that jurisdictional discovery of Dotcom Retail's contacts throughout the United States is necessary for "a determination of the best venue in the United States for this lawsuit." This is not a valid basis for the nation-wide discovery NuboNau seeks, nor is the fact that Dotcom Retail invoked Rule 4(k)(2) in its motion to dismiss. The fact is that NuboNau makes no showing whatsoever that jurisdiction is appropriate here under Rule 4(k)(2), and seeks relevant discovery only on the "bare allegation," in the face of denials by Dotcom Retail, that such jurisdiction exists. *Terracom,* 49 F.3d at 562.

Finally, the Court notes that, in an email correspondence with counsel for NB Labs and Cult Beauty *after* the motions to dismiss were filed, counsel for NuboNau originally requested information "specifically related to your client's connections to California, including any efforts to market or sell its products to consumers in California." No request was made for nationwide discovery, even though NuboNau was aware at the time that Defendants were arguing against federal jurisdiction under Rule 4(k)(2). Jurisdictional discovery is warranted when "pertinent facts bearing on the question of jurisdiction are *controverted ...."* *Data Disc,* 557 F.2d at 1285 n. 1 (emphasis added). It's not warranted when a plaintiff has no facts to support jurisdiction and is simply in search of some.

(Dkt. No. 24 at 8.)

2    The Ninth Circuit distinguished between "purposeful availment" and "purposeful direction" in *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 801 (9th Cir.2004). An availment analysis, most often used in suits sounding in contract, looks for "evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Id.* at 802. A direction analysis, most often used in suits sounding in tort, looks for "evidence of the defendant's action outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere." *Id.* at 803. The Court will use the "purposeful direction" analysis because a trademark action is more akin to a tort suit, and indeed, the acts of Dotcom Retail at issue took place outside of California.

3    The Court acknowledged this in its order on jurisdictional discovery: "While Dotcom Retail's argument for dismissal is that it has no legal responsibility for the BeautyBay website, it appears willing to stand in the place of BeautyBay for the purpose of NuboNau's request for jurisdictional discovery." (Dkt. No. 24 at 7 .)

4    This is the point NuboNau misses in citing and relying on: (1) *Stomp, Inc. v. NeatO, LLC,* 61 F.Supp.2d 1074 (C.D.Cal.1999); (2) *Allstar Marketing Group, LLC v. Your Store Online, LLC,* 666 F.Supp.2d 1109 (C.D.Cal.2009); and (3) *Chanel, Inc. v. Lin,* 2010 WL 2557503 (N.D.Cal. May 7, 2010). (*See* Opp'n Br. at 18–19.) In *Stomp, Inc.,* a patent infringement case, the Northern District of California decided it had jurisdiction over a company that sold *the allegedly infringing products* over the internet to California residents. 61 F.Supp.2d at 1077 ("The products being sold on NeatO's website incorporate the technology of the # 446 patent at issue."). In *Allstar Marketing Group,* too, a trademark and copyright infringement case, a district court exercised personal jurisdiction over a defendant that operated "a highly commercial website through which regular sales of *allegedly infringing products* are made to customers in this state." 666 F.Supp.2d at 1122 (emphasis added). Finally, specific jurisdiction in *Chanel, Inc.* wasn't premised on the defendant's

sale of just *any* products in California, but on its use of an interactive website "to advertise and sell *infringing products.*" 2010 WL 2557503 at *5 (emphasis added).

5    Citing the same data sheets, NuboNau interprets them to mean that "Google advertisements were displayed over 4 million times to U.S. residents, and resulted in over twenty eight thousand click-thru visits to BeautyBay.com from U.S. residents, with over four thousand of those click-thru visits from California residents." (Opp'n Br. at 13.) The Court does see that BeautyBay.com received over 28,000 click-thru visits from the United States, but it doesn't see the basis for NuboNau's assertion that Google ads for BeautyBay.com were displayed 4 million times to residents of the United States.

6    It can also be the fact that the plaintiff and defendant are competitors *and* the defendant knows that the forum state is the plaintiff's principal place of business. *See The Bear Mill, Inc. v. Teddy Mountain, Inc.,* 2008 WL 2323482 at *6 (D.Idaho May 7, 2008) ("The fact that the parties are competitors in the teddy bear and franchise business, coupled with Defendant's knowledge of the location of Plaintiffs' business, begs the question as to whether the 'something more' requirement under the 'effects' test is satisfied. Given the confluence of such factors, jurisdiction should be recognized here."). This principle is not implicated in this case, at least as between NuboNau and Dotcom Retail.

7    Just as "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State," an internet advertisement that happens to pop up in a forum state isn't necessarily purposefully directed there. *Asahi Metal Industry Co., Ltd. v. Superior Court of California,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

8    The Court finds particularly instructive the Central District of California's treatment of an argument similar to NuboNau's in *Life Alert,* 2008 WL 5412431 at *4. The Court will quote that decision at length because it is precisely on point here.

     Plaintiff also points to the fact that Dr. Arkinstall has been using Google Analytics, a service of the California-based Google, Inc., since January 2007 to generate reports regarding user activity on the website. Google Analytic's Terms of Service requires users to submit disputes arising from its use of the service to the jurisdiction of the courts in Santa Clara, California and it provides that their relationship with Google is governed by California law. Since Defendant agreed to those terms, Plaintiff argues, Defendant should be deemed to have invoked the protection and benefits of California law. That argument is not convincing, because that agreement does not apply to disputes that are unrelated to one's use of Google Analytics. More importantly, Plaintiff's claim does not arise out of Defendant's "contract" with Google. Defendant's use of Google has nothing to do with the activity that gave rise to this trademark action—Defendant's attempt do [sic] business with California and United States residents.

9    The Court has already determined that *general* personal jurisdiction couldn't be established in this case. (Dkt. No. 24 at 2–3 ("The Defendants are all based in the United Kingdom, and there is no indication whatsoever that their operations in California or any other state, if any, are so continuous and substantial that they can be said to be physically present there.").) NuboNau seems to concede this. (Opp'n Br. at 16 ("Second, NuboNau asserts that none of the Defendants are subject to the courts of general jurisdiction of any state.").)

10   Also, NB Labs explains that Ms. Wiener was an independent contractor, not an employee of the company, and that she didn't promote the NUBO brand as much as seek potential opportunities for it. (Reply Br. at 8.) The Court doubts this makes a substantial difference in the analysis.

11   NB Labs suggests that all shipments went out in 2009, but the Court reads the UPS records for the shipments to Bliss and Fred Segal differently. (*See* Opp'n Br. at 6.)

12   If NuboNau has included this denial in the record, the Court cannot locate it. The Court simply trusts Paul Walker's declaration on this point. (Opp'n Br., Walker Decl. ¶ 5.) It takes the July 29, 2010 date from an email sent by Philip Walker to Paul Sillence. (*See* Opp'n Br., Walker Decl., Ex. 4.)

13   NB Labs may have an even better argument than Dotcom Retail and Cult Beauty that its website isn't purposefully directed towards the United States because it lists prices in pounds sterling and includes a charge for the United Kingdom's VAT tax. (Dkt. No. 11–2, Shcherbinina Decl. ¶ 5.) NB Labs also claims that its website "states that NB Labs does not ship to the United States." (Dkt. No. 41 at 4.)

14   Probably the best argument NuboNau can make is that *industry insiders* might be confused as to whether NUBO products have anything to do with NuboNau, but those people are not consumers, and they are probably *un* likely to be confused, anyway. Unlike the consumer, who makes a purchasing decision based on rather limited, superficial information that pops out on a product's packaging or in its advertisement, a cosmetics buyer for a retail chain has a highly developed sense of who its suppliers are and how their products are differentiated. Ms. Saxby, the Bergdorf Goodman cosmetics buyer, would well understand that NB Labs is based in the United Kingdom and is a completely different company from the San Diego-based NuboNau. She would also be perfectly able to distinguish their respective products.

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.